United States Court of Appeals
Fifth Circuit

**F I L E D**

September 25, 1998

Charles R. Fulbruge III
Clerk

**Revised October 16, 1998**

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

_____

No. 97-20517
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

AARON MOREL LeBARON, also known as Jason Troy
Barter, also known as Shawn Harvey Yates,

Defendant-Appellant.

Appeal from the United States District Court
For the Southern District of Texas

Before REYNALDO G. GARZA, HIGGINBOTHAM, and EMILIO M. GARZA,
Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Aaron Morel LeBaron appeals his convictions on one count of
conspiracy to obstruct religious beliefs, in violation of 18 U.S.C.
§§ 247 and 2, and two RICO counts, in violation of 18 U.S.C. §§ 1962
(c) and (d). He contends that the district court improperly
admitted extrinsic evidence of bad acts under Federal Rule of
Evidence 404(b). He also appeals the denial of his post-conviction
motion to dismiss certain counts of the indictment, alleging

incorrect application of the rule of specialty. We affirm.

I

Ervil LeBaron, Aaron's father, founded the Church of the Blood of the Lamb of God, a polygamous patriarchal religion. According to the Church doctrine, people who covenanted with the Church but left or challenged Ervil, the "Great Grand Patriarch", became "Sons (or Daughters) of Perdition." To bring about the Kingdom of God on earth, members believed they were obliged to kill each "Son of Perdition" or risk damnation themselves. Ervil wrote the Book of the New Covenant of the Millennial Church of Jesus Christ, in which he named Daniel Jordan, Ed Marston, Duane Chynoweth, and Mark Chynoweth as "Sons of Perdition."[1]

After several leadership changes, Aaron became the Great Grand Patriarch. Aaron's sister and wife, Cynthia LeBaron, testified that Aaron taught about the Sons of Perdition. Aaron held meetings to plan for the execution of Jordan, who had established a church in Colorado, because Jordan was "keeping the Kingdom of God from progressing." To carry out his plan, Aaron and some siblings, including Cynthia, came to stay with Jordan and professed membership in Jordan's church. Heber LeBaron met Aaron near the camp while Jordan was on a planned family hunting trip. Heber

_____

[1] Before Ervil died, his followers split into two groups. The group loyal to Ervil, including Aaron, went to Mexico. The group that left Ervil's Church included Daniel Jordan, Ed Marston, Duane Chynoweth, and Mark Chynoweth.

wanted to kill Jordan, and Aaron ordered him to do so. Jordan was shot and died at the camp.

Later and in a separate incident, Aaron found guns in a truck stolen by Church members. He considered this to be "a sign from God that it was time to kill" Ed, Duane, and Mark, "the Sons of Perdition in Texas." Aaron instructed Cynthia to go to Houston to take care of the Sons of Perdition, and gave her money to travel there to meet Heber. Aaron also ordered Heber by phone to carry out their deaths, and "before [Heber] made any decisions about things he would have to run it by Aaron so Aaron could approve." In Houston, Heber killed Mark in the office of Mark's appliance repair business. To kill the three men simultaneously, Heber assigned his siblings to kill Ed in Dallas and Duane in Houston. Both men were killed as they went to make appliance repair pick-ups for their respective appliance repair businesses. Heber had Duane's eight-year-old daughter Jenny, who witnessed Duane's death, killed to eliminate her as a witness. Cynthia, one of the participants in the Texas murders, confessed her participation and agreed to testify against Aaron in exchange for total immunity.

Based largely on Cynthia's testimony, a grand jury returned a fourteen count superseding indictment against Aaron.[2] The United

_____

[2] The fourteen-count superseding indictment alleged Conspiracy to Commit Murder for Consideration, in violation of 18 U.S.C. § 1952A (Count 1), Murder for Consideration, in violation of 18 U.S.C. §§ 1952A and 2 (Counts 2-4), Conspiracy to Tamper with a Witness, in violation of 18 U.S.C. §§ 371 and 1512 (Count 5), Tampering with a Witness, in violation of 18 U.S.C. §§

-3-

States requested extradition of Aaron, a Mexican citizen, pursuant to the United States-Mexico Extradition Treaty. The Mexican Government extradited Aaron, consenting to the prosecution of certain charges outlined in the Resolution of Extradition ("Resolution") and denying consent to other charges.[3] When prosecution proceeded on all fourteen counts, Aaron challenged the district court's jurisdiction over the charges to which Mexico had withheld consent. After Mexico protested the trial of unauthorized charges, the district court dismissed Counts 2 through 8, and 10 through 12. The jury convicted Aaron of Counts 1, 9, 13, and 14. The district court granted a post-verdict motion for acquittal on Count 1 and sentenced Aaron on the remaining three.

## II

Aaron argues for reversal of his convictions because the district court admitted extrinsic evidence of Jordan's murder at trial in contravention of Federal Rule of Evidence 404(b).[4] We

---

1512(a)(1)(C) and 2 (Count 6), Use of Firearm, in violation of 18 U.S.C. §§ 924(c)(1) and 2 (Counts 7-8), Conspiracy to Obstruct Religious Beliefs, in violation of 18 U.S.C. §§ 247(a)(2) and 371 (Count 9), Obstruction of Religious Beliefs, in violation of 18 U.S.C. §§ 247 and 2 (Counts 10-12), and RICO violations, in violation of 18 U.S.C. §§ 1962 (c) and (d) (Counts 13-14).

[3] A formal extradition request must be accompanied by supporting documents. A district judge in Mexico will give a judicial opinion to Mexico's Ministry of Foreign Affairs concerning the merits of the request. The outcome of this opinion is the resolution whether to grant extradition. The "Resolution of Extradition" delineates for which charges extradition is granted.

[4] FED. R. EVID. 404(b) provides, in part:

-4-

review the district court's decision to admit extrinsic evidence under Rule 404(b) for abuse of discretion. *See United States v. Chavez,* 119 F.3d 342, 346 (5th Cir.)(per curiam), *cert. denied*, __ U.S. __, 118 S. Ct. 615, 139 L. Ed. 2d 500 (1997). The district court found that the evidence was relevant to show design, motive, and scheme, and that its relevance and need outweighed the prejudice.

In *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (en banc), we interpreted Rule 404(b) to require a two-step test: First, we must determine whether extrinsic offense evidence is relevant to an issue other than the defendant's character. *See id.* (stating standard for relevancy is established by Rule 401). Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice. *See id*. at 913 (explaining second step is whether the evidence satisfies Rule 403).

*Beechum*'s relevancy threshold is satisfied if evidence is relevant to an issue other than propensity to commit the act, such as intent, motive, or plan. *See* FED. R. EVID. 404(b). When extrinsic evidence is offered to prove intent, the relevancy of

---

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, k n o w l e d g e , identity, or absence of mistake of accident . . .

such evidence is ascertained by comparing the state of mind in perpetrating the different offenses. *See United States v. Gordon*, 780 F.2d 1165, 1173 (5th Cir. 1986) (describing relevancy inquiry for issue of intent). Extrinsic evidence also may be relevant if it indicates a comprehensive plan. *See United States v. West*, 22 F.3d 586, 595 (5th Cir. 1994) ("The other crime is admitted to show this larger goal rather than to show defendant's propensity to commit crimes.")(citation omitted); *United States v. Krezdon*, 639 F.2d 1327, 1331 (5th Cir. Unit A Mar. 19, 1981)(explaining that extrinsic evidence is admissible to raise inference of a larger plan).

Aaron contended during trial that he took no part in the murders. Aaron's continual emphasis that he was in Mexico during the murders made it incumbent upon the Government to elicit evidence tying Aaron to these murders. Aaron contends that the plans were dissimilar because evidence of Aaron's active role in Jordan's murder is dissimilar to his passive role in ordering the Texas murders. We find this argument unpersuasive.

Jordan's murder is relevant to establish similar intent and plan. Aaron had the same reason for ordering both the Colorado and Texas murders--as Great Grand Patriarch, he ordered Heber and other Church members to kill the Sons of Perdition. Jordan's murder is relevant to show a unifying scheme of killing the Sons of Perdition to attain the Kingdom of God on earth. *See United States v.*

-6-

*Anderson*, 933 F.2d 1261, 1273 n.7 (5th Cir. 1991)(stating extrinsic evidence insufficient to show plan if crimes are "planned" the same way, but rather each crime must be a part of some overall scheme).

The second *Beechum* step considers whether the probative value is substantially outweighed by the prejudicial value. The probative value "must be determined with regard to the extent to which the defendant's unlawful intent is established by other evidence, stipulation, or inference. It is the *incremental* probity that is to be balanced against its potential for undue prejudice." *Beechum*, 582 F.2d at 914 (emphasis added); *see id.* at n.18 (agreeing that probative value is determined in reference to the "necessity" for the extrinsic evidence).

Extrinsic evidence is highly probative in a conspiracy case. "In the context of a conspiracy case, the mere entry of a not guilty plea sufficiently raises the issue of intent to justify the admissibility of extrinsic offense evidence." *Gordon,* 780 F.2d at 1174. Aaron's denial of guilt renders the evidence of Jordan's murder highly probative on the intent issue.

The probative value is augmented if there is slight direct evidence. *See Williams*, 900 F.2d at 827 ("The very limited evidence the government could adduce on the issues of knowledge and intent increases the incremental probity of the extrinsic evidence."). The Government's use of Jordan's murder as a Son of Perdition, by order of Aaron, was probative of Aaron's similar

intent, motive, and plan in killing Ed, Duane, and Mark. Aaron argues, however, that the government wanted to use the extrinsic evidence because its case rested almost wholly on Cynthia's testimony, a felon and perjurer. However, the limited evidence on the issue of Aaron's intent in ordering the Texas murders, and Aaron's attack on Cynthia's credibility, increases the incremental probity of the extrinsic evidence. *See United States v. Henthorn,* 815 F.2d 304, 308 (5th Cir. 1987) (finding probative value of extrinsic offense evidence outweighed possible prejudice where defendant pled not guilty and attacked credibility of witness).

We also consider whether the prejudicial value of the evidence substantially outweighed its probative value. Aaron contends that the emotional testimony of Jordan's murder, presented at the start of the government's case-in-chief,[5] was unfairly prejudicial because the jury may have been more likely to convict him for the extrinsic offense. The court minimized the danger of *undue*

---

[5] Part of Aaron's argument on appeal is that prejudice arises because the Government introduced the evidence at the start of the case-in-chief. However, the running objection to the extrinsic evidence that Aaron made at trial did not go to the order of proof. *United States v. Williams*, 604 F.2d 1102, 1113 n.5 (8th Cir. 1979). Further, at trial the district court judge suggested that the Government wait to offer the extrinsic evidence until after the defendant had impeached Cynthia. Counsel responded "If they're going to bring it out, we'd just as soon they bring it out now, Judge." Based on this waiver, we cannot find that the trial court abused its discretion to control the order of proof. *See Huddleston*, at 690, 108 S. Ct. at 1501 ("The trial court has traditionally exercised the broadest sort of discretion in controlling the order of proof.").

prejudice by instructing the jury, under Federal Rule of Evidence 105,[6] to consider Jordan's murder solely "to establish a plan or scheme . . . as it relates to the crimes charged in the indictment" and "for the very limited purpose of determining whether Mr. LeBaron's state of mind at the time alleged in the indictment in this case was sufficient to establish a motive or intent to commit the crimes alleged in the indictment." *See Huddleston v. United States,* 485 U.S. 681, 691-92, 108 S. Ct. 1496, 1502, 99 L. Ed. 2d 771 (1988) (stating Rule 105 safeguards against undue prejudice); *United States v. White*, 972 F.2d 590, 599 (5th Cir. 1992)("[D]anger of prejudice to the defendant is minimal so long as it is clear to the jury that the extrinsic evidence is being introduced for the sole purpose of showing intent."); *see generally* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS § 1.30, at 44-45 (West 1997) (similar acts).

Under *Beechum,* the evidence of Aaron's direction to Heber to kill Jordan is relevant to his intent and motive in the Texas murders. Due to Aaron's denial of guilt and challenge to Cynthia's testimony, in conjunction with the district court's limiting instruction, the prejudicial value of the evidence is not

---

[6]     FED. R. EVID. 105 provides:

When evidence which is admissible as to one party or for one purpose        but not admissible as to another party or for another purpose is        admitted, the court, upon request, shall restrict the evidence to its        proper scope and instruct the jury accordingly.

substantially outweighed by its probative value.  We cannot say that the district court abused its discretion in admitting the evidence of Dan Jordan's murder.

## III

Aaron argues that the district court erred in denying his motion to dismiss Counts 9 and either 13 or 14 under the doctrine of specialty.  Under this doctrine, a "requisitioning state may not, without the permission of the asylum state, try or punish the fugitive for any crimes committed before the extradition except the crimes for which he was extradited."  *United States v. Miro,* 29 F.3d 194, 199 (5th Cir. 1994)(citation omitted).  The extradition treaty between the United States and Mexico expressly includes the doctrine: "A person extradited under the present Treaty shall not be detained, tried or punished in the territory of the requesting Party for an offense other than that for which extradition has been granted . . . ." Extradition Treaty, May 4, 1978, [1979] United States-United Mexican States, 31 U.S.T. 5059, 5071 (Extradition Treaty).  We review *de novo* whether an extradition satisfies the doctrine of specialty.  *See United States v. Khan*, 993 F.2d 1368, 1372 (9th Cir. 1993).

## A

The Resolution acknowledged that the United States's extradition request had attached the superseding indictment, which

cited fourteen counts.[7]   The Resolution recharacterizes the fourteen counts in the indictment as eight charges:

> . . . a) two charges of the use of a firearm during the commission of a crime of violence, against that which is put forth in Title 18, Section 924 (C)(1) and(2) of the United States Code (U.S.C.); b) one charge of being involved in a fraudulent, influential, and corrupt organization, in violation of Title 18, Section 1962 of the U.S.C.; c) three charges of contracting murder-for-hire, violating Title 18, 1952 (A) and (2) (Renumbered as Section 1958) of the U.S.C.; d) one charge of bribing a witness, in violation of Title 18, Section 1512 (A)(1)(C) and (2) of the U.S.C.; and e) criminal conspiracy to commit a homicide, violating Title 18, Section 1952 (A) of the U.S.C.; . . .

The Resolution later stated that:

> The extradition of Aaron . . . is granted . . . for the following charges:  one charge of being involved in a fraudulent, influential, and corrupt organization and criminal conspiracy to commit homicide. . . . Extradition is not granted for the charges of:  two charges of the use of a firearm during the commission of a crime of violence, three charges of contracting murder-for-hire and one charge of bribing a witness . . .

The different descriptions of the counts in the indictment and the charges in the Resolution created confusion regarding the counts on which Aaron could be prosecuted.  At the request of the United States for detailed specification of the counts to which Mexico had consented, Mexico sent an explanatory diplomatic note that stated, in pertinent part:

> The first point of resolution of said Order authorizes the processing of [the defendant] . . . for the following charges:
> 1.   One charge for being involved in a fraudulent, influential and corrupt corporation, in violation of

---

[7] *See supra* note 2.

> Section 1962(c) and (d) of Title 18 of the United States Code.
> 2. Conspiracy to commit murder, in violation of Sections 247 and 1952 A of Title 18 of the United States Code.

Based on this note, the district court granted the Government's motion to dismiss Counts 2-8 and 10-12. Aaron subsequently was convicted on Counts 1 (Conspiracy to Commit Murder for Consideration), 9 (Conspiracy to Obstruct Religious Beliefs), 13 (RICO conspiracy), and 14 (substantive RICO); the court later ordered acquittal on Count 1.

Aaron moved post-verdict to dismiss for want of jurisdiction Counts 9 and either 13 or 14, contending that Mexico authorized conspiracy to commit homicide (Count 1) and only one RICO Count (Count 13 or 14). The district court, persuaded that the note referred to the statutory section numbers for Counts 1, 9, 13 and 14, denied this motion.

B

Whether Aaron has standing to raise the doctrine of specialty is an undecided issue in this circuit. *See United States v. Kaufman,* 858 F.2d 994, 1009 n.5 (5th Cir.1988) (declining to address standing issue), *reh'g denied*, 874 F.2d 242, 243 (5th Cir. 1989) (per curiam). We need not decide this issue because, even assuming *arguendo* that Aaron has standing to challenge jurisdiction, we find that prosecution on the four counts did not violate the doctrine.

Initially, we find that the Resolution may seem ambiguous.

-12-

The charges listed in the Resolution do not directly correlate to the numbered counts in the superseding indictment. Accordingly, we consider whether Aaron was prosecuted for additional counts or offenses beyond those for which he was extradited.

In *Fiocconi v. Attorney General of United States*, 462 F.2d 475, 481 (2d Cir. 1972), the defendants challenged the court's jurisdiction to try them on a superseding indictment that added offenses subsequent to the ones for which they were extradited. The Second Circuit explained that the doctrine of specialty operates to prevent extradictees from indiscriminate prosecution, particularly for political crimes. *See id.* "[I]n the absence of any affirmative protest from [the sending country]," the Second Circuit did "not believe that Government would regard the prosecution of [the defendants] for subsequent offenses of the same character as the crime for which they were extradited as a breach of faith by the United States." *Id*.

The Ninth Circuit has reached the same conclusion. In *United States v. Andonian,* 29 F.3d 1432, 1435 (9th Cir. 1994), a grand jury returned a superseding indictment after the defendants were extradited. The defendants argued that trial on the superseding indictment violated the doctrine of specialty because the indictment that formed the basis for the extradition had contained fewer counts. The court rejected this argument because "[t]he superseding indictment altered neither the nature of the

-13-

scheme alleged nor the particular offenses alleged." *Id.* at 1437.

These cases suggest that the doctrine of specialty is concerned primarily with prosecution for different substantive offenses than those for which consent has been given, and not prosecution for additional or separate counts of the same offense. The appropriate test for a violation of specialty "is 'whether the extraditing country would consider the acts for which the defendant was prosecuted as independent from those for which he was extradited.'" *Id.* at 1435 (citations omitted).

Moreover, we do not believe Mexico would consider the acts for which Aaron was prosecuted to be independent from those for which he was extradited. Aaron maintains that the difference in descriptions of the counts in the indictment and the charges in the Resolution is significant. We should not assume that the extraditing country is cognizant of the Federal Rules of Criminal Procedure on charging a criminal indictment, and Aaron has produced no evidence that "one charge" in Mexico has the same meaning as "one count" in the United States.

The Resolution described the RICO counts as "one charge of being involved in a fraudulent, influential, and corrupt organization, in violation of Title 18, Section 1962 of the U.S.C.," and Mexico consented to extradition on this basis. The Resolution also described "criminal conspiracy to commit a

-14-

homicide, violating Title 18, Section 1952 (A)," to which Mexico also consented.  For the remaining charges described in the Resolution, Mexico expressly withheld its consent.  The words that Mexico used later in the Resolution to give or withhold consent clearly correlate with the specific words it used earlier in the Resolution to articulate the charges.

This correlation suggests that the use of the singular word "one" in Mexico's Resolution does not limit prosecution from "two" RICO counts to "one."  The Resolution referred to the two RICO counts in the indictment as one charge when initially describing those charges.  Mexico's consent to the "one" RICO charge in the Resolution can be understood as consent for both RICO counts in the indictment.  Indeed, Mexico expressed its full consent for prosecution of the RICO offenses, as Mexico had described them in the Resolution.  This interpretation is bolstered by the fact that, in response to the United States's request for clarification, Mexico's explanatory letters specifically referenced §§ 1962 (c) *and* (d), which were the statutory basis for Counts 13 *and* 14.  Mexico never expressed opposition to prosecution under any portion of § 1962.  Based on Mexico's authorization for the RICO charges in the Resolution, its citation of the statutory predicates for Counts 13 and 14, and its failure to object to trial on both counts, we find that Mexico would not consider the RICO acts for which Aaron was

-15-

prosecuted to be independent of the RICO acts for which he was extradited.

Similarly, we must determine whether Mexico's consent to prosecute "criminal conspiracy to commit homicide" authorized prosecution on Count 9, conspiracy to obstruct religious beliefs. In the explanatory letter, Mexico specifically authorized prosecution under § 247, which appears only in Count 9. Like Counts 13 and 14, never has Mexico expressly objected to prosecution for Count 9. Aaron contends that license to prosecute "conspiracy to commit murder" does not license prosecution for conspiracy to obstruct religious beliefs. We previously found in *United States v. Barlow*, 41 F.3d 935, 943 (5th Cir. 1994)(per curiam), that "the plain language of § 247 manifests Congress' specific intent to make criminal, inter alia, the conduct at issue here: the killing of Ed, Mark, and Duane for the sole reason that they chose to exercise their right to extricate themselves from the beliefs, practices, and fellowship of the Church." For these reasons, we find that Mexico would not consider Aaron's conviction for conspiracy to obstruct religious beliefs to be an offense so separate from the one for which he was extradited as to be a breach of faith by the United States. *See Fiocconi*, 462 F.2d at 481.

IV

In summary, the district court properly admitted the

-16-

extrinsic evidence of bad acts under Rule 404(b).  Additionally, we find no violation of the doctrine of specialty, and thus the district court had jurisdiction to try the defendant for Counts 9, 13, and 14.  Accordingly, Aaron's convictions are AFFIRMED.