Jose Pablo LOPEZ, Appellant

v.

The STATE of Texas, Appellee

NO. 01–15–00055–CR

Court of Appeals of Texas,
Houston (1st Dist.).

Opinion issued April 26, 2016

Discretionary Review Refused
August 24, 2016

Winston E. Cochran, Jr., League City, TX, for Appellant.

Jack Roady, Criminal District Attorney, Galveston County, Texas, Rebecca Klaren, Assistant District Attorney, Galveston County, Texas, Galveston, TX, for Appellee.

Panel consists of Justices Jennings, Massengale, and Huddle.

## OPINION

Rebeca Huddle, Justice

In 2001, Appellant Jose Pablo Lopez was indicted for capital murder for causing Mario Espinosa's death by employing others—namely, Ramiro Baltazar, Jose Badillo, and Elisandro Salinas—to commit Espinosa's murder for remuneration or the promise of remuneration. In 2012, Lopez was extradited from Mexico to stand trial in Galveston County, Texas. The jury returned a guilty verdict, and Lopez was sentenced to life in prison, with the possibility of parole. In six issues, Lopez complains that (1) his prosecution violated the Extradition Treaty between the United States and Mexico, (2) the jury charge misapplied the *mens rea* element and caused egregious harm, and (3) his sentence violates both the United States Constitution and the Texas Constitution. We affirm.

## Factual Background

### Espinosa's Murder

Twenty-two year-old Espinosa was murdered at his cousin Michelle Rodriguez's house shortly after midnight on June 18, 2001. According to Rodriguez's testimony, she answered a knock at her door, and two men asked for Espinosa. Rodriguez woke Espinosa. Espinosa told Rodriguez he did not know who they were and asked her to come to the door with him. Rodriguez testified that, with the door barely cracked, the two men asked Espinosa to sell them drugs. Espinosa told the men he did not sell drugs. They asked again, and Espinosa again told them no. Three shots were fired, and Rodriguez kicked the door closed. Espinosa fell back and told Rodriguez, "I love you. Take care of my babies." Espinosa later died at the hospital.

Lopez was indicted for capital murder. The State alleged that Lopez had knowingly and intentionally caused Espinosa's death by employing Baltazar, Badillo, and Salinas for $10,000 or the promise of $10,000, to murder Espinosa, and that Baltazar, Badillo, and Elisandro did murder Espinosa.

### Non–Accomplice Witness Testimony

The evidence at trial demonstrated that Lopez and Espinosa each had an on-and-off relationship with Virginia Perez. Ac-

cording to Perez's sister, Tina Hernandez, after becoming pregnant with Espinosa's child, Perez and Espinosa lived together in Perez's parents' house. In 1997, Perez and Espinosa's son, Mario, Jr., was born. Sometime later, Espinosa was sentenced to one year of incarceration for smuggling marijuana. While Espinosa was incarcerated, Perez lived with his cousin, Rodriguez. Multiple witnesses testified that, while Espinosa was incarcerated, Perez became pregnant with another man's child and began seeing Lopez. Hernandez testified that Lopez became obsessed with Perez. Though Lopez was not the biological father, Perez named her second son after Lopez, and Lopez cared for the child as his own.

Vanessa Paelicke, formerly a caseworker with Child Protective Services ("CPS"), testified regarding the care and custody of Perez's children. Paelicke testified that CPS opened an investigation in January 2000, after Perez's older son was twice treated for burns while in Perez's care. As the assigned caseworker, Paelicke's role was to visit with the family and to develop a plan to address CPS's concerns so that the children could remain in the home. Paelicke became concerned about the children having contact with Lopez. At Paelicke's request, Perez signed a voluntary agreement with CPS specifying that she would not allow Lopez to have contact with the children. Nevertheless, Perez soon returned to living with Lopez and bringing her children into contact with Lopez. As a result, on June 5, 2001, CPS removed the children from Perez's care. Both children were placed with Espinosa and his cousin, Rodriguez.

Multiple witnesses testified about threats Lopez made against Espinosa in the days and weeks before Espinosa's murder. Hernandez recalled one occasion approximately two months before Espino-

sa's murder. At the time, Hernandez was bartending and selling cocaine for Lopez. Hernandez testified that, before the bar opened one day, she saw Lopez crying because Perez had recently left him. Hernandez told him, "She's going to go back to [Espinosa]. You're not going to get her." Still crying, Lopez then told Hernandez that he knew what he had to do: kill Espinosa.

Hernandez also testified about a threat Lopez made against Espinosa approximately one month before Espinosa's murder. Hernandez was with her parents, Espinosa, and Perez's two children at her parents' house. Perez and Lopez arrived, and Perez and Espinosa started arguing about custody of the children. Hernandez testified that Lopez got out of the car and started arguing with Espinosa while holding a gun in his hand. Hernandez recalled Lopez saying to Espinosa, "Bitch, you're going to die. Don't worry. You're going to die. I got you. You know you're going to die. I'm tired of this shit." Hernandez reported the incident to CPS that day.

Another one of Perez's sisters, Dela Perez, testified that she overheard Lopez talking about custody of Perez's children months before Espinosa's murder and heard him say that he was going to "get" Espinosa.

Rodriguez testified that Lopez and Espinosa had a confrontation outside her home roughly two weeks before Espinosa's murder. According to Rodriguez, Lopez told Espinosa, "I'm not going to dirty my hands on you. I have something for you." Espinosa walked away without responding.

Multiple witnesses also offered testimony suggesting Lopez hired men to kill someone. Osbaldl Flores frequented Lopez's bar and sold cocaine for Lopez. Flores recalled talking with Lopez at his bar one night a few weeks before Espinosa's murder. Flores testified that Lopez

asked him whether he "knew anybody that would take care of somebody for him." Flores figured Lopez just wanted somebody beaten up. Flores asked why Lopez could not do it himself; Lopez reiterated that he just wanted "somebody taken care of." Flores refused. Flores testified that, one or two weeks before Espinosa's murder, Lopez brought up the same subject. After a cookout at Lopez's house, Lopez twice asked Flores if he could find out if anybody could take care of somebody for Lopez. Flores testified that Lopez said he would pay. Again, Flores refused.

Bertaldo Diaz, a long-time friend of Lopez's cousin, Elisandro Salinas, also frequented Lopez's bar. Diaz testified that, a few days before Espinosa's murder, he overheard Lopez tell Salinas that he wanted Salinas "to hire two guys to get rid of some guy he was having problems with." Diaz testified that Lopez said he wanted them to get rid of his "girlfriend's baby daddy." At the time, Lopez was dating Perez. Diaz testified that he heard Salinas say that he would try to find some guys for Lopez. Diaz further testified that he was with Salinas the day before Espinosa's murder, and he and Salinas met with Lopez. Diaz testified that, at the meeting, he overheard Lopez ask Salinas whether he had found "guys to do the job." Diaz recalled Lopez saying to Salinas, "I'll give you 10,000 and ... you do what you do with the money and keep the rest."

Cynthia Lucio, a friend of Lopez's, testified about events she observed the weekend of Espinosa's murder. Lucio knew Ramiro Baltazar and saw him at Lopez's bar that Saturday. Lucio testified that she asked Baltazar what he was doing at the bar, and Baltazar responded, "I got to do [Lopez] a favor." Knowing that Lopez was involved with selling drugs, Lucio next asked whether it was related to drugs. Baltazar responded, "No, I don't even mess with drugs." Lucio then asked, "if it wasn't for drugs, are you going to hurt or kill somebody or what?" Baltazar laughed and shook his head, but never answered.

Lucio testified that she was with Lopez, Perez, Salinas, Badillo, Baltazar, and others at Lopez's bar the next night—the night of Espinosa's murder. Lucio testified that Baltazar told her to come out on the following Tuesday. He told her, "I'm going to get $10,000 and I'm going to pay for all the beer and everything." Later that evening, several people in the group—including Lucio, Lopez, and Perez—were leaving to go to another bar. Salinas, Badillo, and Baltazar were leaving Lopez's bar too, but Lucio did not know where they were headed. Lucio testified that she saw Lopez hand a white napkin or piece of paper to Baltazar before leaving.

Hernandez also saw Lopez and Perez out at a bar that night. Hernandez testified that Perez borrowed Hernandez's phone at about 11:00 p.m., while Lopez was in the bathroom. She explained that Lopez did not allow Perez to have her own cell phone, likely because Perez kept calling Espinosa. Hernandez testified that Perez called Espinosa and started crying while talking with him. Hernandez testified that when Lopez came out of the bathroom and saw Perez crying on the phone, he assumed she was talking with Espinosa. Hernandez recalled Lopez saying to Perez, "I'm tired of this mother fucker. He's dead. This bitch is going to die tonight. I don't have to do it myself. I can pay somebody to do it."

Espinosa's murder occurred shortly thereafter. Officer E. Cox testified about his investigation into Espinosa's murder. That night, Rodriguez told the responding officers that there had been two bald, Hispanic shooters. The Medical Examiner testified that Espinosa had a fatal gunshot wound in the center of his chest. He

explained that the bullet went through Espinosa's breastbone, through his aorta, and into his spine. The Medical Examiner recovered a .380 or .38 caliber bullet from Espinosa's body. He testified that Espinosa's cause of death was a penetrating gunshot wound to the chest and the manner of death was homicide.

Officers also found .22 caliber casings on the front porch of Rodriguez's house. Surveillance video from Walmart showed Salinas, accompanied by Badillo and Baltazar, purchasing .22 caliber bullets at 11:15 p.m. on June 17, 2001—shortly before Espinosa's murder.

Susie Bustamente, one of Lopez's bartenders, testified that Lopez called her after he was initially questioned by the police the day after Espinosa's murder and told her to collect all the money out of the bar. Per Lopez's instructions, she brought the money to Lopez's brother's house. An officer involved in the investigation testified that, two days after Espinosa's murder, Lopez's family was removing pool tables and other property from the bar.

Both Rodriguez and Hernandez testified that Lopez and Perez left for Mexico within days of Espinosa's murder.

### Accomplice Witness Testimony

Badillo, who pleaded guilty to Espinosa's murder and was serving a 40–year sentence, testified as an accomplice witness at Lopez's trial. Badillo testified that he knew Lopez from the bar and that he knew Salinas from high school. Badillo explained that he first met Baltazar when Salinas introduced them on the day of Espinosa's murder. Salinas told him that Lopez needed someone killed and offered Badillo $2,000 if he would give Baltazar a ride. Baltazar told Badillo that "If you go [Lopez's] bar, [Lopez] give you their name and the address." Badillo testified that he did not ask any other questions and did not care who was going to be killed, but did agree to participate.

Badillo testified that he did go to Lopez's bar that night with Baltazar. He saw Lopez and Baltazar talking outside and then, like Lucio, he saw Lopez give Baltazar a piece of paper. Badillo testified that Espinosa's name and address were written on the paper.

Badillo testified that Salinas supplied him and Baltazar with a .22 and a .380 and that Salinas, Baltazar, and Badillo then went to Walmart to purchase bullets for the .22.

Badillo testified that when he and Baltazar arrived at Espinosa's later that night, Baltazar was scared and offered Badillo $2,000 to come with him to Espinosa's door. Badillo agreed. Badillo detailed how he and Baltazar approached and shot Espinosa at the door, as Rodriguez described.

Badillo testified that, afterwards, he and Baltazar returned the guns to Salinas. Baltazar called Lopez to get paid, but Lopez did not answer. Lopez never paid Baltazar, and Baltazar never paid Badillo. Though they tried to hide, police officers eventually found and arrested Badillo and Baltazar.

Baltazar also testified as an accomplice witness. Like Badillo, Baltazar was serving a 40–year sentence for Espinosa's murder. Baltazar testified that he was hired to murder Espinosa, but he refused to say who hired him. Baltazar testified that he shot Espinosa with a .380 handgun. Baltazar admitted that he had given a statement to police after he was arrested, but said he lied to police about "[p]retty much the whole story." In particular, Baltazar testified that the police threatened him while taking his statement and that he never said Lopez was the person who hired him to murder Espinosa.

### Lopez's Indictment, Arrest, and Extradition

On July 25, 2001, Lopez was indicted for capital murder for intentionally and knowingly causing Espinosa's death by employing Baltazar, Badillo, and Salinas for remuneration or the promise of remuneration to murder Espinosa. The FBI became involved in finding Lopez after a federal warrant issued in August 2004. Officers received information indicating that Lopez was in Mexico, and Lopez was arrested by Mexican authorities in June 2012.

On August 7, 2012, the Galveston District Attorney requested extradition. On December 2, 2013, the Mexican government authorized extradition. Lopez appealed his extradition, but a Mexican court denied his appeal. On March 25, 2014, Lopez was brought to the United States to stand trial. Shortly thereafter, the Department of Justice sent a letter ("DOJ Letter") to the Assistant Prosecuting Attorney in Galveston concerning Lopez's extradition. The DOJ Letter states:

> The Government of Mexico granted [Lopez's] extradition to stand trial on the following charge as included in Indictment Number 01CR1330, filed on July 25, 2001, in the 122nd Judicial District Court for the State of Texas in Galveston County, Texas.
>
> - Count 1—Murder, in violation of Section 19.03 of the Texas Penal Code
>
> You may proceed only on the above-named charge against the defendant.

Lopez filed a pre-trial motion arguing that the DOJ Letter limited his prosecution to "murder" and extradition was not granted for the offense of "capital murder." In response, the State argued that extradition was granted to prosecute Lopez as indicted under Penal Code section 19.03, noting that the phrase "capital mur-der" is a Texas-specific term and that Lopez was not facing the death penalty. The trial court denied Lopez's motion, noting that the indictment tracks and the DOJ Letter expressly references section 19.03, thereby authorizing prosecution under that section of the Penal Code. Lopez re-urged the same motion before voir dire and was granted a running objection.

After a jury trial, Lopez was found guilty and automatically sentenced to life with the possibility of parole, pursuant to the Texas Capital Felony Statute. Lopez moved for a new trial, and his motion was denied by operation of law. Lopez timely appealed.

### Rule of Specialty

In his first issue, Lopez contends that the trial court erred in denying his request to limit his prosecution to one for murder, rather than capital murder, thereby violating the Extradition Treaty between the United States and Mexico.

### A. Standard of Review and Applicable Law

Treaties are compacts between sovereign nations. *Ex parte Medellin*, 223 S.W.3d 315, 324 (Tex.Crim.App.2006) (citations omitted). As with a contract, interpreting a treaty is a matter of determining the parties' intent. *BG Grp., PLC v. Republic of Argentina*, — U.S. —, 134 S.Ct. 1198, 1208, 188 L.Ed.2d 220 (2014). We must interpret a treaty liberally to give effect to its apparent purpose. *Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 80 (Tex.2000) (citing *Asakura v. City of Seattle*, 265 U.S. 332, 342, 44 S.Ct. 515, 516, 68 L.Ed. 1041 (1924)); *see also Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 10, 57 S.Ct. 100, 103, 81 L.Ed. 5 (1936) ("[T]reaties should be liberally con-

strued so as to give effect to the apparent intention of the parties.").

■ Under a longstanding practice and rule of extradition, a state requesting extradition may only prosecute the extradited individual for the offense charged in the extradition proceedings. *See United States v. Rauscher*, 119 U.S. 407, 424, 7 S.Ct. 234, 243, 30 L.Ed. 425 (1886) (cited by *United States v. Alvarez–Machain*, 504 U.S. 655, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992)); *see also United States v. LeBaron*, 156 F.3d 621, 626 (5th Cir.1998) (explaining that a "requisitioning state may not, without the permission of the asylum state, try or punish the fugitive for any crimes committed before the extradition except the crime for which he was extradited"). Known as "the rule of specialty," this doctrine was incorporated into the extradition treaty between the United States and Mexico at issue in this case. It provides: "a person extradited under [this Treaty] shall not be detained, tried or punished in the territory of the requesting Party for an offense other than that for which extradition has been granted." U.S.—Mexico Extradition Treaty, art.17, May 4, 1978, 31 U.S.T. 5059.

■ Reviewing courts analyze whether an extradition satisfies the rule of specialty de novo. *LeBaron*, 156 F.3d at 626. "The appropriate test for a violation of specialty is whether the extraditing country would consider the acts for which the defendant was prosecuted as independent from those for which he was extradited." *Id.* at 627 (internal quotation marks omitted) (quoting *United States v. Andonian*, 29 F.3d 1432, 1435 (9th Cir.1994)).

## B. Analysis

As he argued to the trial court, Lopez argues on appeal that his prosecution for "capital murder" violated the Extradition Treaty because Mexico authorized his extradition to stand trial only for "Murder." The DOJ Letter is the only record evidence relied upon to establish the crime for which Lopez was extradited. Lopez argues that use of the word "Murder" in the DOJ Letter should be controlling and he should only have been prosecuted for "Murder," an offense found at section 19.02 of the Penal Code. The State responds that the portion of the DOJ Letter permitting that Lopez be prosecuted as indicted for violating section 19.03 of the Penal Code should be controlling and that reference to "Murder" in the letter was merely a generic description of the charged offense without legal import.

■ Assuming arguendo that Lopez has standing to raise a specialty challenge,[1] we conclude that Lopez's prosecu-

1. The State argues as a threshold matter that Lopez lacks standing to raise an alleged violation of the rule of specialty. Texas courts apparently have not addressed this issue, and federal courts are divided on the question of whether an individual defendant has standing to raise the rule of specialty when the asylum state has failed to raise an objection to the proceeding. *Compare United States v. Levy*, 905 F.2d 326, 328 n. 1 (10th Cir.1990) (relying on *United States v. Rauscher*, 119 U.S. 407, 422–23, 7 S.Ct. 234, 242, 30 L.Ed. 425 (1886), to conclude that defendant had unqualified standing to raise a rule of specialty challenge), *with Matta–Ballesteros v. Henman*, 896 F.2d 255, 259 (7th Cir.1990) ("It is well established that individuals have no standing to challenge violations of international treaties in the absence of a protest by the sovereigns involved.") *and United States ex rel. Saroop v. Garcia*, 109 F.3d 165, 168 (3d Cir. 1997) ("Had [petitioner] brought suit invoking the [extradition] treaty or the Rule of Specialty, she would lack standing."). While the Fifth Circuit has arguably indicated that an individual defendant would not have standing to raise a rule of specialty challenge, *see, e.g., United States v. Quiroz*, 137 Fed. Appx. 667, 671 n. 1 (5th Cir.2005) (stating, in *dicta*, that "Defendants have no standing to assert their Specialty Doctrine Argument"

tion did not violate the Extradition Treaty, and the trial court did not err by denying Lopez's request to limit the prosecution to "Murder."

We begin our analysis by noting that the DOJ Letter provides that Mexico granted Lopez's extradition to stand trial on the charge included in Indictment Number 01CR1330, filed on July 25, 2001. In relevant part, that indictment reads:

JOSE PABLO LOPEZ on or about the 18th day of June, A.D., Two Thousand and One, and anterior to the presentment of this indictment in the County of Galveston and State of Texas, did then and there intentionally and knowingly cause the death of an individual, namely Mario Espinosa by employing Ramiro Baltazar and Jose Badillo and Elisandro Salinas, for remuneration and the promise of remuneration, to-wit: money, from the said JOSE PABLO LOPEZ, TO MURDER THE SAID Mario Espinosa, and pursuant to said agreement, the said Ramiro Baltazar and Jose Badillo and Elisandro Salinas, did then and there intentionally and knowingly cause the death of the said Mario Espinosa by shooting the said Mario Espinosa with a deadly weapon, to-wit: a handgun

Section 19.03(a)(3) of the Penal Code, entitled Capital Murder, likewise provides:

(a) A person commits an offense if the person commits murder as defined under Section 19.02(b)(1) and:

. . .

(3) the person commits the murder for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration;

. . .

Tex. Penal Code § 19.03(a)(3). Under section 19.02(b)(1), a person commits murder if he "intentionally or knowingly causes the death of an individual." Tex. Penal Code § 19.02(b)(1). Thus, the plain language of the indictment reflected that Lopez was subject to prosecution under section 19.03(a)(3) of the Penal Code. We also note that the DOJ Letter itself expressly states that Lopez would be prosecuted for a violation of section 19.03 of the Penal Code. The substance of the indictment and specific reference to section 19.03 in the DOJ Letter demonstrates that capital murder is the offense for which extradition was granted.

Notwithstanding the substance of the indictment and specific statutory references in the DOJ Letter, Lopez argues that extradition was granted only for the offense of "murder" because the DOJ Letter uses the word "Murder" and not the term "capital murder." Lopez urges us to find ambiguity in the DOJ Letter and to construe the DOJ's letter in his favor based on various canons of construction. We are unconvinced, however, that there is an ambiguity necessitating resort to canons of construction.

where the offended nation "failed to raise an objection to the proceeding"), it has yet to definitively resolve the standing question. *See United States v. Angleton*, 201 Fed.Appx. 238, 243 n. 12 (5th Cir.2006) ("It is still an open question in this circuit whether a criminal defendant has standing to assert the rule of specialty.").

As an issue of prudential standing, the question of whether an individual defendant has standing to raise a specialty challenge is non-jurisdictional and may be "pretermitted in favor of a straightforward disposition on the merits." *Finstuen v. Crutcher*, 496 F.3d 1139, 1147 (10th Cir.2007) (internal quotation marks omitted). Thus, we assume without deciding that Lopez has standing to assert an alleged violation of the rule of specialty and address his arguments on the merits. *See, e.g., United States v. Davis*, 954 F.2d 182, 186 (4th Cir.1992).

Instead, we agree with the State's argument that giving the single word "Murder" controlling effect would ignore the plain language of the DOJ Letter itself and the fact that different jurisdictions employ different nomenclature to refer to the same offense. Indeed, Article 10 of the Extradition Treaty reflects that the parties recognized and accounted for inter-jurisdictional variations in terminology. Article 10 requires that the requesting party provide "the description of the offense for which extradition is requested," accompanied by (a) a statement of the facts of the case; (b) text of the legal provisions describing elements of the offense; and (c) text of the legal provisions describing punishment for the offense, among other requirements. The parties thus provided a mechanism by which the requesting party must elucidate the details of the acts for which extradition is sought, the legal provisions describing the elements of the charged offense, and the possible punishment associated with the offense. There is no indication in the record that such prescriptions were not followed; nor is there any indication that Mexico objected to Lopez being tried and sentenced as he was. In short, regardless of the DOJ Letter's nominal reference to the charged offense as "Murder," the DOJ Letter's express reference to section 19.03 of the Penal Code compels the conclusion that the State's prosecution of Lopez for the charged offense was authorized by Mexico and thus did not violate the Extradition Treaty. *See LeBaron,* 156 F.3d at 627 (noting that test for violation of specialty is whether extraditing country would consider acts for which defendant was prosecuted as independent from those for which he was extradited and holding that prosecution for two RICO counts set out in the indictment did not violate rule of specialty though Mexico authorized only "one" RICO charge, because use of the words "charge" and "count" varied between juris-

dictions and Mexico expressly referenced statutory basis for both counts in authorizing extradition).

Lopez also argues that a "capital murder" prosecution would categorically run afoul of Article 8 of the Extradition Treaty because capital murder is punishable by death in Texas. Article 8 provides:

When the offense for which extradition is requested is punishable by death under the laws of the requesting Party and the laws of the requested Party do not permit such punishment for that offense, extradition may be refused unless the requesting Party furnishes such assurances as the requested Party considers sufficient that the death penalty shall not be imposed, or, if imposed, shall not be executed.

Noting that the Extradition Treaty's Appendix identifies "murder or manslaughter," but not "capital murder" as extraditable offenses, Lopez urges the conclusion that "capital murder" is not an extraditable offense absent assurances against resort to the death penalty. Lopez's argument, however, ignores the use of "may" in Article 8: "extradition *may* be refused" absent assurances that death shall not be imposed. The plain language of Article 8 reflects that Mexico may have been entitled to refuse extradition unless the United States furnished assurances that the death penalty would not be imposed or executed. But this has no impact on Lopez's prosecution. Whether or not the United States gave such assurances, Mexico did not refuse extradition. It granted extradition and expressly permitted prosecution of Lopez for violating section 19.03.

We overrule Lopez's first issue.

## Jury Instructions

In his second issue, Lopez argues that the jury instructions incorrectly applied

the *mens rea* element by failing to incorporate the law of parties into the application portion of the instructions.

## A. Standard of Review

■ In analyzing a jury-charge issue, our first duty is to decide if error exists. *See Almanza v. State*, 686 S.W.2d 157, 174 (Tex.Crim.App.1984) (op. on reh'g); *Tottenham v. State*, 285 S.W.3d 19, 30 (Tex. App.–Houston [1st Dist.] 2009, pet. ref'd). Only if we find error do we then consider whether an objection to the charge was made and analyze for harm. *Tottenham*, 285 S.W.3d at 30; *see also Warner v. State*, 245 S.W.3d 458, 461 (Tex.Crim.App. 2008) ("The failure to preserve jury-charge error is not a bar to appellate review, but rather it establishes the degree of harm necessary for reversal.").

■ "The degree of harm necessary for reversal depends upon whether the error was preserved." *Hutch v. State*, 922 S.W.2d 166, 171 (Tex.Crim.App.1996). Error properly preserved by a timely objection to the charge will require reversal "as long as the error is not harmless." *Almanza*, 686 S.W.2d at 171. The Court of Criminal Appeals has interpreted this to mean that *any* harm, regardless of degree, is sufficient to require reversal. *Arline v. State*, 721 S.W.2d 348, 351 (Tex.Crim.App. 1986). However, when the charging error is not preserved "and the accused must claim that the error was 'fundamental,' he will obtain a reversal only if the error is so egregious and created such harm that he 'has not had a fair and impartial trial'—in short 'egregious harm.'" *Almanza*, 686 S.W.2d at 171. Fundamental errors that result in egregious harm are those which affect "the very basis of the case," deprive the defendant of a "valuable right," or "vitally affect his defensive theory." *Id.* at 172.

## B. Applicable Law

■ The purpose of the jury charge is to instruct jurors on all law applicable to the case. *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex.Crim.App.2012). "Because the charge is the instrument by which the jury convicts, [it] must contain an accurate statement of the law and must set out all the essential elements of the offense." *Id.* (quoting *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex.Crim.App.1995)). The Court of Criminal Appeals has consistently stated: "[i]t is the application paragraph of the charge, not the abstract portion, that authorizes a conviction." *Yzaguirre v. State*, 394 S.W.3d 526, 530 (Tex.Crim.App.2013). "The application paragraph is what explains to the jury, in concrete terms, how to apply the law to the facts of the case. We look at the wording of the application paragraph to determine whether the jury was correctly instructed in accordance with the indictment and also what the jury likely relied upon in arriving at its verdict, which can help resolve a harm analysis." *Id.*

## C. Error Analysis

Here, though the jury charge included an abstract instruction on the law of parties, it did not apply the law of parties to the elements of capital murder in the application paragraph. In relevant part, the submitted charge provided:

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual.

A person commits the offense of capital murder if he intentionally or knowingly causes the death of an individual and the person commits the murder for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration.

. . . .

A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both.

Each party to an offense may be charged with the commission of the offense.

A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits or encourages or directs or aids or attempts to aid the other person to commit the offense. Mere presence alone will not constitute one a party to an offense.

Now, if you find from the evidence beyond a reasonable doubt that on or about the 18th day of June, 2001 in Galveston County, Texas, the defendant, JOSE PABLO LOPEZ, did then and there intentionally or knowingly cause the death of an individual, namely Mario Espinosa by employing Ramiro Baltazar or Jose Badillo or Elisandro Salinas, for remuneration or the promise of remuneration, to wit: money, from the said JOSE PABLO LOPEZ, to murder the said Mario Espinosa, and pursuant to said agreement, the said Ramiro Baltazar or Jose Badillo or Elisandro Salinas, did then and there intentionally or knowingly cause the death of the said Mario Espinosa by shooting the said Mario Espinosa with a deadly weapon, to wit: a handgun, then you will find the Defendant guilty of Capital Murder as charged in the indictment.

■ Lopez urges us to find error in the charge because the application paragraph does not incorporate the mental state prescribed by Penal Code section 7.02(a)(2) for party liability: "acting with intent to promote or assist the commission of the offense." TEX. PENAL CODE § 7.02(a)(2). Lopez maintains that in the absence of such language in the application paragraph, the charge misapplies the mental state requirement by authorizing a conviction upon finding that Lopez "intentionally or knowingly" caused Espinosa's death. In effect, Lopez argues that the trial judge erred because he did not fully instruct the jury on the law of parties in the application paragraph of the jury charge. In response, the State argues that the sole application paragraph in the charge correctly authorized Lopez's conviction as a principal, not as a party, and correctly stated the elements of the charged offense.

■ Here, tracking the language of section 19.03(a)(3) of the Penal Code, the indictment accused Lopez of intentionally or knowingly causing the death of Mario Espinosa by employing Baltazar, Badillo, and Salinas for remuneration and the promise of remuneration, to wit: money, to murder Mario Espinosa. The jury charge initially gave an abstract instruction on the elements of murder under section 19.03(a)(3), and then correctly applied the facts to the elements of the charged offense. The application paragraph authorized the jury to convict only upon finding beyond a reasonable doubt that Lopez acted "intentionally or knowingly," as required by section 19.03(a)(3). TEX. PENAL CODE § 19.03(a)(3) (providing that a person commits capital murder if he "intentionally or knowingly causes the death of an individual" by employing another to commit the murder for remuneration or the promise of remuneration). Thus, we conclude that the application paragraph authorized conviction of Lopez as a principal under the correct *mens rea* element.[2]

We overrule Lopez's second issue.

2. We note that the trial court's failure to apply the law of parties, about which Lopez

## Constitutional Complaints
## on Sentencing

In his third, fourth, fifth, and sixth issues, Lopez contends that an automatic sentence of life, with the possibility of parole, violates both the United States Constitution and the Texas Constitution because it robs Lopez of an individualized hearing in which he could present mitigation evidence. Specifically, Lopez argues that his sentence violates the Eighth Amendment's prohibition on cruel and unusual punishment as well as the prohibition on cruel or unusual punishment found in Article I, section 13 of the Texas Constitution, and violates the Fourteenth Amendment due process guarantee as well as the "due course of law" guarantee found in Article I, section 19 of the Texas Constitution. In effect, these four issues challenge the constitutionality of the Texas Capital Felony Statute, which prescribed Lopez's automatic sentence of life, with the possibility of parole.

### A. Standard of Review

 Facial challenges to the constitutionality of a criminal statute present questions of law, which an appellate court reviews de novo. *Ex parte Lo*, 424 S.W.3d 10, 14 (Tex.Crim.App.2013). Our review begins with the presumption that the challenged statute is valid and that the legislature did not act arbitrarily or unreasonably in enacting it. *Rodriguez v. State*, 93

S.W.3d 60, 69 (Tex.Crim.App.2002) (citing *Ex parte Granviel*, 561 S.W.2d 503, 511 (Tex.Crim.App.1978)). As a result, the burden of establishing a statute's unconstitutionality rests with its challenger. *Id.*

### B. Protections against cruel and unusual punishment

In his third and fourth issues, Lopez contends that his sentence violates both the Eighth Amendment's protection against "cruel and unusual punishment" and the protection against "cruel or unusual punishment" provided by Article I, section 13 of the Texas Constitution. Though urged as distinct issues, the Court of Criminal Appeals has found no distinction between the protections offered under these two constitutional provisions. *See Cantu v. State*, 939 S.W.2d 627, 645 (Tex. Crim.App.1997) (finding no significance in differences between Eighth Amendment's "cruel and unusual" phrasing and Texas Constitution's "cruel or unusual" phrasing). Accordingly, we analyze Lopez's third and fourth issues together.

 Article I, section 13 of the Texas Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted." Tex. Const. art. I, § 13. The Eighth Amendment of the United States Constitution similarly provides: "Excessive bail shall not be required, no excessive

complains, helped Lopez insofar as party liability enlarges criminal responsibility. *See Goff v. State*, 931 S.W.2d 537, 544 (Tex.Crim. App.1996) (law of parties permits State to enlarge defendant's criminal responsibility to include acts in which he may not have been principal actor); *Campbell v. State*, 910 S.W.2d 475, 477 (Tex.Crim.App.1995) ("One cannot be harmed if the trial judge refuses to enlarge the criminal liability.").
We also note that the trial court's inclusion of an instruction on the law of parties in the abstract portion of the charge, about which

Lopez does *not* complain on appeal and to which Lopez did not object in the trial court, is, likewise, not a basis for reversal. *See Plata v. State*, 926 S.W.2d 300, 302–03 (Tex.Crim. App.1996) ("The inclusion of a merely superfluous abstraction, therefore, never produces reversible error in the court's charge because it has no effect on the jury's ability fairly and accurately to implement the commands of the application paragraph or paragraphs.") *overruled on other grounds by Malik v. State*, 953 S.W.2d 234 (Tex.Crim.App.1997).

fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII. The Eighth Amendment has been applied to the States through the operation of the Due Process Clause of the Fourteenth Amendment. *See Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463, 67 S.Ct. 374, 376, 91 L.Ed. 422 (1947). The Eighth Amendment's prohibition against "cruel and unusual punishment," as applied by the United States Supreme Court, is measured by the "evolving standards of decency that mark the progress of a maturing society." *Roper v. Simmons*, 543 U.S. 551, 561, 125 S.Ct. 1183, 1190, 161 L.Ed.2d 1 (2005) (quoting *Trop v. Dulles,*. 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality op.)).

■ Lopez contends that his mandatory life sentence, with the possibility of parole, violates the prohibition against cruel and unusual punishment because it deprived him of an opportunity to present mitigation evidence during an individualized sentencing hearing. Lopez acknowledges that the Supreme Court's holding in *Harmelin v. Michigan*, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), unequivocally provides that the imposition of a mandatory sentence of life in prison *without* the possibility of parole does not violate the Eighth Amendment's protection against cruel and unusual punishment. He further acknowledges that a number of Texas cases have adhered to *Harmelin*. *See, e.g., Duran v. State*, 363 S.W.3d 719, 721–23 (Tex.App.–Houston [1st Dist.] 2011, pet. ref'd). Similarly, Lopez acknowledges that multiple courts have held that the Eighth Amendment does not guarantee that adult defendants, like their juvenile counterparts, receive a mitigation hearing when given a sentence of life, with the possibility of parole. *See, e.g., Turner v. State*, 443 S.W.3d 128, 129 (Tex.Crim.App. 2014); *Lewis v. State*, 448 S.W.3d 138, 146–47 (Tex.App.–Houston [14th Dist.]

2014, pet. ref'd). Under these precedents, a mandatory life sentence for an adult defendant does not violate constitutional protections against cruel and unusual punishment.

Lopez nevertheless argues that *Miller v. Alabama*, —— U.S. ——, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), calls *Harmelin* into question. In *Miller*, the Supreme Court held that mandatory life-without-parole sentences for juveniles violate the Eighth Amendment's prohibition on cruel and unusual punishment. *Id.* at 2464. Importantly, *Miller* applies only to juvenile defendants, who were not at issue in *Harmelin*. *Id.* at 2470 ("*Harmelin* had nothing to do with children and did not purport to apply its holding to the sentencing of juvenile offenders."). We therefore conclude that *Miller* did not alter *Harmelin* as Lopez suggests.

Lopez was not a juvenile at the time of the charged offense, so *Harmelin*—not *Miller*—is controlling. Accordingly we conclude that the Eighth Amendment is not violated by the imposition of a mandatory sentence of life, with the possibility of parole. *See Harmelin*, 501 U.S. at 994–95, 111 S.Ct. 2680.

We overrule Lopez's third and fourth issues.

## C. Due process guarantees

■ In his fifth and sixth issues, Lopez contends that his sentence violates both the Due Process Clause of the Fourteenth Amendment and the "due course of law" guarantee found in Article I, section 19 of the Texas Constitution. Multiple Texas appellate courts have held that mandatory sentencing statutes do not violate constitutional due process rights. *See, e.g., Lewis*, 448 S.W.3d at 147; *Moore v. State,* 54 S.W.3d 529, 544 (Tex.App.–Fort Worth 2001, pet. ref'd) (mandatory life sentence did not violate due process rights and defendant had no right to mitigation hear-

ing); *Williams v. State,* 10 S.W.3d 370, 372–73 (Tex.App.–Tyler 1999, pet. ref'd) (mandatory life sentence did not violate due process rights). Lopez relies on *Stanley v. Illinois,* 405 U.S. 645, 657–58, 92 S.Ct. 1208, 1216, 31 L.Ed.2d 551 (1972) (holding unwed father entitled to hearing on his fitness as a parent before children could be taken from him after death of their mother), and *Bell v. Burson,* 402 U.S. 535, 542–43, 91 S.Ct. 1586, 1591, 29 L.Ed.2d 90 (1971) (holding motorist entitled to hearing before taking his license under statute that required loss of license if uninsured driver involved in an accident), to argue that it is appropriate to deviate from the line of cases rejecting due process challenges to mandatory life sentences. Considering a similar argument in *Lewis,* our sister court found *Stanley* and *Burson* to be readily distinguishable and to offer little guidance on due process rights in the context of criminal sentencing. *Lewis,* 448 S.W.3d at 147. We agree, and thus, we decline to deviate from the line of cases rejecting Lopez's due process argument. We further note that Lopez presents no argument or authority to suggest the Texas Constitution bestows greater protection than the Fourteenth Amendment in this regard. *See Muniz v. State,* 851 S.W.2d 238, 251–52 (Tex.Crim.App. 1993) ("State and federal constitutional claims should be argued in separate grounds, with separate substantive analysis or argument provided for each ground."); *Heitman v. State,* 815 S.W.2d 681, 690 n. 23 (Tex.Crim.App.1991).

We overrule Lopez's fifth and sixth issues.

## Conclusion

We affirm the trial court's judgment.