**Affirm and Opinion Filed October 21, 2021**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-19-00821-CR**

**BRENDA DELGADO, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 363rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F15-76401-W**

## OPINION

Before Justices Molberg, Nowell, and Reichek
Opinion by Justice Molberg

Appellant Brenda Delgado was convicted of capital murder and sentenced to life imprisonment without the possibility of parole.[1] She now raises eleven issues on appeal. Because we find no reversible error, we affirm the trial court's judgment.

EVIDENCE PRESENTED AT TRIAL

Dr. Kendra Hatcher was shot and killed in the parking garage at her apartment building in Uptown Dallas on September 2, 2015. The ensuing Dallas Police Department investigation determined she was shot by Kristopher Love, who was

---

[1] The State did not seek the death penalty. *See* TEX. PENAL CODE § 12.31(a).

driven to the site by Crystal Cortes. They combined to kill Hatcher at the bidding of appellant, who wanted Hatcher out of the picture after Hatcher started dating appellant's ex-boyfriend, Dr. Ricardo Paniagua. As promised, Love and Cortes received money, drugs, or both from appellant in exchange for killing Hatcher.

After being questioned by police, appellant fled to Mexico. She was indicted for capital murder on October 22, 2015. Appellant remained in Mexico until she was finally arrested by Mexican police on April 8 of the next year, and she was brought to trial in Dallas County in May 2019.

At trial, Detective Eric Barnes, the lead detective investigating the case, testified that he arrived at the crime scene and learned that surveillance video identified a black Jeep Cherokee as a suspect vehicle. Without much else to go on, police released the video to the media the day after the murder to enlist the public's help. Jose Ortiz testified that he recognized the Jeep on the news as his own. He had loaned it to appellant and Cortes on the morning of the killing.

Ortiz testified that after he recognized his Jeep on the news, he and appellant met up and he questioned her about it. At first, appellant tried to convince him it was not his Jeep. But eventually appellant told him that when Cortes was using the Jeep, she "went to go get some drugs for somebody . . . and that probably something went wrong." Appellant told Ortiz not to pick up the phone if Cortes called "because she [did not] know what [Cortes] got involved in." Appellant urged Ortiz not to say anything to anyone because he could "get in trouble with the police" and "[risk his]

citizenship." Ortiz testified appellant recommended he "hide [the Jeep] and probably paint it a different color," and she offered to help pay for the paint job. Ortiz thought appellant was trying to manipulate him by mentioning his immigration status.

Later that day, Ortiz contacted the police to let them know he believed it was his Jeep on the news as the one possibly involved in the murder. Detective Barnes brought Ortiz to the police station and interviewed him, where Ortiz told Barnes he had lent his Jeep to appellant and Cortes on the morning of the offense. Ortiz told police appellant and Cortes told him Cortes's car was having mechanical issues, so they left the BMW they were driving with Ortiz, and he gave them his Jeep to use in the meantime. Appellant and Cortes told Ortiz that they would be together all day using the Jeep. Ortiz did not know anything about any planned murder. As far as he knew, appellant and Cortes were simply dropping off a car for him to work on.

Appellant was supposed to come back after work to return the Jeep, but instead she called Ortiz and told him to meet her at a Chili's in Carrollton. When Ortiz arrived, appellant was there alone. She told Ortiz that she had been dropped off by a friend and that Cortes had the Jeep. They had drinks and appetizers before leaving a little after 9 p.m. Shortly before they left, appellant tried to call Cortes, and she told Ortiz that her phone was not getting through and she needed to borrow his to make the call. Appellant spoke with Cortes outside and gave her Ortiz's home

–3–

address so they could meet there to exchange the cars. They met up, and Ortiz got his Jeep and appellant and Cortes got the BMW.

The BMW was not appellant's or Cortes's car either. Appellant got it from her friend, Roberto Menendez, the day before. Menendez testified that on Tuesday, September 1, appellant texted him asking if he could fix her car, a Lexus. He went by appellant's apartment after work and they switched cars. Appellant took Menendez's gold BMW even after Menendez told her his car had a significant mechanical problem and did not always run. The plan was for Menendez to take appellant's car to the shop the next day, then on Wednesday evening they would meet up at around 7:30 in the evening to get dinner and switch cars back.

But when 7:30 p.m. Wednesday arrived, Menendez testified appellant did not answer her phone. Menendez finally heard from her at 9:30 p.m. when he was eating at Gloria's in Uptown, and she agreed to meet him in the parking garage to get her car back. She arrived with Cortes.

Cortes, who cooperated with the State after reaching a plea-bargain agreement, implicated appellant in Hatcher's murder. Cortes testified appellant resented Hatcher because Hatcher was dating appellant's ex-boyfriend, Paniagua. Appellant wanted Paniagua back, and eventually appellant made up her mind that she "wanted to get rid of Kendra Hatcher." Appellant asked Cortes if she knew anyone "who could take care of it," and Cortes agreed to help.

Cortes and appellant had numerous discussions and meetings, planning how to kill Hatcher. They considered injecting her with heroin or a sedative or shooting her with a gun. Appellant asked Cortes if she knew anyone else who could help because Cortes was from "a rundown neighborhood." They drove around together, "asking people if they would be able to help" and "if they weren't credible enough, [they] would just leave them hanging."

One day, appellant and Cortes ran into Love, Love's children, and their friend, Kelly Ellis, at Cortes's brother's house. Cortes and appellant "asked them if they [could] help [them] in committing a murder," and they went with Love to his apartment to discuss it. They talked about different methods of killing Hatcher, "and everybody came to the agreement [that] shooting her would be the fastest way to do it." Cortes testified that appellant was involved in the discussion. Appellant, Cortes, and Love eventually pushed Ellis out of the plan because he was not being sufficiently discreet.

Cortes testified that she and appellant went to Academy to buy a gun, but they changed their minds when they considered that "it would fall back on [them]." Eventually, Love acquired a Smith & Wesson handgun, which he showed to appellant and Cortes at his apartment. Cortes testified that it was decided that she was going to be the shooter and Love was going to drive, but in the end, they swapped roles because Cortes knew Dallas better. Cortes testified she found a firearms dealer through social media and called, asking if they had a silencer for a

.40 caliber Smith & Wesson. Later, an extraction of appellant's phone discovered a video created on the phone on August 27 that recorded a conversation about a silencer for such a weapon.

Cortes testified that she and Love would be compensated by appellant for killing Hatcher. Appellant, who held herself out as a member of a cartel, was going to give Love "drugs and money," and she was going to give Cortes money. According to Cortes, appellant was flaunting her money and spreading it around in the days prior to the murder.

Cortes stated appellant "had [Paniagua's] iPhone account loaded to another iPhone, and she was able to track him that way," so they knew he bought plane tickets for a trip to Mexico with Hatcher on September 3, which was Labor Day weekend. They also knew that after that weekend Paniagua and Hatcher would be moving to San Francisco. They picked September 2 to carry out their plan before Hatcher could get away. Appellant wanted "to make it look like a robbery gone bad."

To decide where to carry out the killing, Cortes testified she and appellant followed Hatcher on her daily routine. They followed her to work and to the parking garage at her building. They were able to enter the garage by first parking in a visitor's spot, waiting for a car with garage access privileges to drive up, and then tailing the vehicle into the garage. At Hatcher's work, they watched her with

binoculars from across the street at a Salvation Army store. Appellant and Cortes did this a few times, but on the day of the murder, it was just Love and Cortes.

The day before the murder, the trio did a "dry run." Appellant, Cortes, and Love drove from Love's apartment to Hatcher's work, and then to Hatcher's apartment to get a sense of timing. Afterwards, they dropped off Love and went to the dental office where appellant worked to get gloves, syringes, disinfectant spray, and wipes. Appellant and Cortes also stole a temporary paper license plate from a blue Durango at an apartment complex in North Dallas to put on the Jeep before the murder.

Cortes testified that on the day of the murder she and appellant picked up Love and dropped him off at a Jack in the Box before going to Ortiz's car shop to exchange Menendez's BMW for the Jeep. They did not want to use the BMW because it was not reliable. They returned to the Jack in the Box, picked up Love, and then dropped off appellant at a library in Carrollton. Cortes and Love then drove to The Gables, where Hatcher resided, and parked across the street for thirty minutes to an hour. From there, they drove to Hatcher's work and saw that it was not yet open. Thereafter, Cortes dropped off Love before picking up her son and nephew from school, and she took them to a Sonic and dropped them off with her grandmother.

Cortes picked up Love again and they drove back to Hatcher's work. Hatcher left work, and they followed her for a time but eventually lost her in traffic. They beat her to The Gables, followed someone through the gate into the garage, and

parked. Appellant had showed them that Hatcher drove a white Toyota Camry, and they knew from their prior scouting runs where she typically parked. They parked facing the garage's entrance so they could see when Hatcher entered. Love was in the backseat with the gun, cleaning it and the bullets and clip to try to avoid leaving fingerprints on anything.

They waited thirty minutes to an hour before Hatcher arrived and parked near them. Love, who was wearing gloves, exited the Jeep with the gun and approached Hatcher. Cortes said she did not see Love kill Hatcher, but she "heard the shots fired." The medical examiner later testified Hatcher died as a result of a gunshot wound to the back of the head. Cortes backed out of her parking space, and Love "ran into the Jeep with [Hatcher's] belongings, her purse and a Nikon camera" and the gun. Love got in the rear passenger side door and crouched down to avoid being seen. Cortes at first drove the wrong way, incorrectly thinking there was another exit, and then drove "back around and exited the way [she] entered." Cortes drove them to an abandoned house in Pleasant Grove "to clean the Jeep" of fingerprints and put its real license plates back on. Love went through Hatcher's purse and kept the cash he found in her wallet. Cortes dropped off Love and then drove to her grandmother's house to pick up her son.

Cortes met appellant and Ortiz at Ortiz's house to trade the Jeep for the BMW. They took the BMW and drove to Gloria's in Uptown to return it to Menendez and to get appellant's Lexus back. They then drove in the Lexus to Waxahachie to get

–8–

rid of Hatcher's belongings, but they did not find a suitably secluded area. They returned to Cortes's grandmother's home, where they burned "the items inside the wallet," as well as the hoodie Cortes had been wearing, and Love's t-shirt. Cortes kept the purse and wallet.

Cortes testified appellant bought $600 worth of marijuana and $300 worth of cocaine, and she gave it and some amount of cash to Love. Cortes testified she received $500 from appellant. Police found a photo of money on Cortes's phone that was taken early on the morning of September 4; around the same time, a photo of Cortes and appellant was taken. Barnes testified he obtained a search warrant to search appellant's apartment after she was in custody. Police found a Chase ATM receipt from August 28 for a $500 withdrawal.

After learning from Ortiz that appellant had borrowed the Jeep, Detective Barnes testified he arranged to speak with appellant at the station. Appellant told him that on the day of the murder she started her day at a library in Carrollton, and that Cortes took her there because her car was in the shop with Menendez. Barnes testified appellant was generally "having a hard time remembering how she got from place to place," but she "was very confident that she had a receipt in her possession from Chili's" from that night. Without prompting, appellant volunteered that her phone died while she was at Chili's and she asked a waitress for a charger. Appellant denied knowing Hatcher. But Barnes testified a later extraction of appellant's cell phone uncovered a saved photo of Hatcher and Paniagua, which was admitted at

trial. When Barnes showed appellant a picture of the black Jeep, she denied knowing anything about it, though she said Cortes had borrowed it. Appellant told Barnes that after learning about the shooting and the Jeep's apparent involvement, she did not ask Cortes about what happened.

Police collected a surveillance video from Ortiz's neighbor that showed appellant and Cortes at Ortiz's house the night of the murder, exchanging the Jeep for the BMW. It was admitted as an exhibit at trial, and Ortiz testified that he, appellant, and Cortes were the people depicted in the video. Barnes testified the video contradicted what appellant told him several times—that she had gone straight home after being at Chili's.

Cell phone data placed appellant with Cortes and Love before the killing. Data from appellant's phone was admitted at trial that revealed appellant's phone was "on the cell tower nearest to [Love's] apartment" on September 1 at 7:41 a.m. On the day of the murder, appellant's phone was "hitting off the cell tower nearest to the Jack in the Box at Royal and Stemmons" at 10:22 a.m., where Cortes testified they had dropped off Love. Data from Love's and Cortes's phones also showed them to be at that Jack in the Box around that time. At 3:36 p.m., the data revealed appellant's phone "to be at the Carrollton Public Library." An extraction of Ortiz's cell phone revealed a call was made at 7:47 p.m. from his phone to Cortes's phone in the Carrollton area shortly after the murder, which was around the time Cortes said appellant called her from Ortiz's phone. Cortes called appellant about forty-

five minutes after the killing; the record of that call was deleted from appellant's phone. Moreover, the cell phone evidence showed appellant and Cortes contacted each other ninety-nine times over a two-week period, from August 22 to September 4.

Love was eventually arrested, and his car was impounded. An ATF canine trained to find explosives and gunshot residue alerted on the car's center console, though nothing but an ashtray appeared to be there. But when the detective pulled up the plastic of the console, he saw "the butt of a gun sitting underneath the ashtray." It was a .40 caliber Smith & Wesson. The crime lab ran tests on a cartridge case found at the crime scene and confirmed the handgun found in Love's car was the weapon used to kill Hatcher.

At trial, others testified about appellant's obsession with and desire to harm Hatcher. Appellant's cousin, Moses Martinez, testified he and appellant were not close, but that he started seeing more of her in 2015. Appellant was depressed about her breakup with Paniagua, and they discussed Kendra Hatcher. Martinez at first testified appellant asked him "to just scare [Hatcher]" with a baseball bat, and appellant said she would pay him, though she never told him that she was trying to hurt Hatcher. When the State showed him his testimony from a prior hearing, however, Martinez acknowledged appellant wanted him to hit Hatcher with the bat. Appellant showed Martinez the baseball bat she wanted him to use.

Appellant's friend, Jennifer Escobar, described appellant as "super obsessed with" and angry towards Paniagua after he broke up with appellant. Escobar said appellant had a copy of Paniagua's house key, tracked Paniagua's movements on her phone, and had access to his bank and e-mail accounts. Appellant showed Escobar transactions he made and "would go through his e-mail."

Escobar testified appellant asked her "to eliminate Kendra Hatcher" by injecting her with something fatal. Appellant also wanted Escobar to put Paniagua "in a coma with a bat." In return, appellant would give Escobar "drugs, $2000, and a car." Escobar, after discussing it with her parents, decided not to get involved in the plot.

Appellant's friend Menendez, who had loaned her his BMW, also testified that appellant constantly brought up Hatcher when he spent time with her. Menendez once questioned appellant about why she was so obsessed with Hatcher, and "she got mad and she stopped talking" to him for three or four days. One evening, appellant asked Menendez to take her to "visit a friend," and told him to drive to The Gables apartments in Uptown. Menendez later saw news reports about this offense and recognized The Gables, where Hatcher lived and was killed, as the apartments to which appellant took him. Menendez also testified that in June of 2015, appellant asked if he could get her a gun. He said he could not because he did not like guns and did not have anything to do with them. They did not discuss the subject again.

An extraction of appellant's cell phone corroborated the testimonial evidence about appellant's motive. An image of Paniagua and Hatcher was saved on appellant's phone on June 15, 2015. A screenshot of the "Find My iPhone" tracking app, which appeared to be tracking Paniagua's phone, was created on May 25, 2015. Images of Paniagua's Frontier Airlines reservations were saved on March 21, 2015. And an image of Paniagua's social security card was also found on appellant's phone.

ANALYSIS

*Sufficiency of the evidence*

Appellant argues in her first issue that the evidence was insufficient to prove that the murder was committed for remuneration. Because she seems to make both sufficiency arguments and arguments based on article 38.14 of the code of criminal procedure, we will address each issue separately.

We review the sufficiency of the evidence under the single standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979); *see Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.). Under that standard, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 318–19. This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id*. at 319.

The trier of fact may choose to disbelieve all or any part of a witness's testimony. *Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018). "A court's role on appeal is restricted to guarding against the rare occurrence when the factfinder does not act rationally." *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018).

When the trial court's charge authorizes the jury to convict on more than one theory, the guilty verdict will be upheld as long as the evidence is sufficient on any one of the theories. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). Circumstantial evidence is as probative as direct evidence and can alone be sufficient to establish an accused's guilt. *Id*.

Appellant was indicted under two theories of capital murder. The indictment alleged appellant

> [d]id then and there intentionally and knowingly cause the death of Kendra Hatcher, an individual, hereinafter called deceased, by employing Kristopher Love to murder deceased for remuneration and the promise of remuneration, to wit: drugs and United States currency, from defendant and a drug cartel, and pursuant to said agreement, the said Kristopher Love did then and there intentionally and knowingly cause the death of the said deceased by shooting deceased with a firearm, a deadly weapon,
>
> And did further unlawfully then and there intentionally cause the death of Kendra Hatcher . . . by shooting deceased with a firearm, a deadly weapon, and the defendant was then and there in the course of committing and attempting to commit the offense of robbery of said deceased[.]

The jury charge authorized conviction under either theory, incorporating a law of parties instruction for the second. But because we find the evidence sufficient to support the jury's verdict under the first theory, we need not address the second. *See*

–14–

*Guevara*, 152 S.W.3d at 49.  For the first theory, appellant was charged with capital murder under section 19.03(a)(3) of the penal code: a person commits capital murder if she commits murder—that is, "intentionally or knowingly causes the death of an individual"[2]—and she "employs another to commit the murder for remuneration or the promise of remuneration."  *See* TEX. PENAL CODE § 19.03(a)(3).

The State presented evidence of appellant's motive for wanting Hatcher dead. *See Nisbett*, 552 S.W.3d at 265 ("While motive is not by itself enough to establish guilt of a crime, it is a significant circumstance indicating guilt.").  Appellant was angry after Paniagua broke up with her, and she became obsessed with his new relationship with Hatcher.  Appellant either wanted Paniagua back or she wanted to get back at him for breaking up with her.  Numerous witnesses testified to this motive, including Cortes, Menendez, Escobar, and Martinez.  Furthermore, evidence from appellant's phone corroborated this motive: appellant tracked Paniagua's phone and saved images of him and Hatcher, their plane tickets, and Paniagua's social security card.

Cortes testified appellant asked her to kill Hatcher in exchange for money. Martinez and Escobar also testified appellant asked them if they would either harm or kill Hatcher.  But Cortes testified she agreed to help appellant, and she and appellant found Love, who also agreed to participate in the plot to kill Hatcher.

---

[2] TEX. PENAL CODE § 19.02(b)(1).

Cortes testified appellant promised to give her money and Love drugs and money in exchange for helping to kill Hatcher.

Cortes testified the threesome agreed shooting Hatcher was the best way to kill her. The plan was to make the killing look like a robbery gone wrong. Evidence showed Hatcher was shot in the back of the head at her apartment's parking garage by a .40 caliber Smith & Wesson that was later found in Love's car. Surveillance footage from the garage showed a black Jeep exiting the garage just after the shooting. Ortiz testified it was his Jeep, which he had loaned to appellant and Cortes the morning of the shooting. He further testified appellant and Cortes returned the Jeep to him that night. A neighbor's security camera captured appellant and Cortes returning the Jeep to him sometime after the shooting. A video, created days before the killing, was found on appellant's phone that recorded a conversation about acquiring a silencer for a handgun like the one used.

Cortes testified appellant bought $600 worth of marijuana and $300 worth of cocaine, and she gave it and some amount of cash to Love. Cortes testified she received $500 from appellant. An ATM receipt found in appellant's apartment showed that she withdrew $500 a few days before the killing. Police found a photo of money on Cortes's phone that was taken two days after the shooting, and at the same time, a photo of Cortes and appellant had been taken.

Cell phone data admitted at trial showed appellant was with Cortes and Love before the shooting, and appellant and Cortes called each other ninety-nine times

over a period spanning from August 22 to September 4. Cortes called appellant about forty-five minutes after the murder. The record of that one call was deleted from appellant's phone. After being questioned by police, appellant fled to Mexico.

Appellant argues there was no evidence of an "acceptance of the offer" by Love. But the State was required to prove appellant employed Love "to commit the murder for remuneration or the promise of remuneration." *See* TEX. PENAL CODE § 19.03(a)(3). Cortes testified Love "was supposed to get drugs and money" for killing Hatcher. She further testified that, the day after the murder, she and appellant got about $600 worth of marijuana and $300 worth of cocaine, which they then gave to Love. She stated appellant also gave Love cash, though she was unsure of the amount.

Viewing all of the evidence in the light most favorable to the verdict, we conclude a rational factfinder could have found beyond a reasonable doubt appellant caused Hatcher's death by employing Love to shoot her, Love did shoot and kill Hatcher, and he did so for drugs and money, which he received from appellant as promised. Accordingly, sufficient evidence supported the jury's verdict finding appellant guilty of capital murder under section 19.03(a)(3). *See Jackson*, 443 U.S. at 318–19. Having found the evidence sufficient, we will now address article 38.14, which appellant also raises in her first point of error.

–17–

*Non-accomplice evidence*

We conclude that sufficient non-accomplice evidence corroborated the testimony of Cortes, the only accomplice who testified, as required by article 38.14. "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. art. 38.14. Not mandated by common law or the U.S. or Texas constitutions, this rule "reflects a legislative determination that accomplice testimony implicating another person should be viewed with a measure of caution." *Blake v. State*, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998).

In deciding whether the evidence is sufficiently corroborated by non-accomplice evidence, we must eliminate the accomplice testimony from consideration and then examine the rest of the record to see if there is any evidence that tends to connect the accused with the commission of the crime. *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001). "[T]he evidence must simply link the accused in some way to the commission of the crime and show that rational jurors could conclude that this evidence sufficiently tended to connect the accused to the offense." *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008) (cleaned up).

"Each case must be judged on its own facts"—there is no set amount of non-accomplice evidence required. *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App.

1994).  Apparently insignificant circumstances may constitute sufficient evidence of corroboration, though a defendant's mere presence at the scene of the crime, without more, is insufficient.  *Malone*, 253 S.W.3d at 257.  While motive and opportunity evidence is insufficient on its own, "both may be considered in connection with other evidence that tends to connect the accused to the crime."  *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011).

Ample non-accomplice evidence—everything other than Cortes's testimony—tended to connect appellant to Hatcher's murder.  As discussed above, several witnesses other than Cortes testified that in the months leading up to the offense appellant was obsessed with Hatcher and expressed a desire to hurt or kill her; an extraction of appellant's cell phone corroborated these other witnesses' testimony.  Appellant engaged in a double car swap the day before and the day of the murder.  The second car she borrowed, the Jeep, was captured on video in Hatcher's parking garage before and after the shooting.  Ortiz testified he loaned the Jeep to appellant and Cortes the morning of the shooting, and they returned it that night, after the shooting.  This latter exchange was captured on video that was admitted at trial.  Ortiz testified appellant encouraged him to paint the Jeep a different color after he confronted her about the fact that the Jeep was on the news.  Days before the shooting, a video was created on appellant's phone of a conversation about a silencer for a .40 caliber Smith & Wesson—the type of weapon used to kill Hatcher.  Appellant's cell phone data placed her with Cortes and Love on the day of

the murder, and it showed an extraordinary number of communications with Cortes over a short period of time before and after the killing. Two photos found on Cortes's phone—one of cash and one of appellant and Cortes—were determined to have been taken in close proximity to each other early on September 4, two days after the murder.

Thus, significant evidence other than Cortes's testimony "tend[ed] to connect the defendant with the offense committed[,]" and it did not "merely show[] the commission of the offense." *See* TEX. CODE CRIM. PROC. art. 38.14. Instead, it showed appellant was motivated to kill Hatcher and appellant was connected to the vehicle, weapon, and people used to kill Hatcher around the time that she was killed.

Appellant argues the corroborative facts did not prove the remuneration element. But "the testimony of an accomplice witness in a capital murder case need not be corroborated on the element which elevated the murder to a capital murder." *Anderson v. State*, 717 S.W.2d 622, 631 (Tex. Crim. App. 1986) (citing *Holladay v. State*, 709 S.W.2d 194 (Tex. Crim. App. 1986)).

Appellant also argues "the corroborating evidence was just as consistent with innocent activity by [appellant] as with the murder plot theory espoused by Cortes." She further argues it "is just as likely that Cortes was responsible for enticing Love to act as an emblem of her 'loyalty' to [appellant]—that Cortes had the audacity . . . to do what [appellant] could only wish for." But our role on appeal is limited to reviewing whether any non-accomplice evidence "tended to connect" appellant to

–20–

the commission of the offense. For the above reasons, we conclude that it did. Appellant's first issue is overruled.

*Judicial notice*

In overruling appellant's first issue, we also deny her request to take judicial notice of documents she included in the appendix of her original brief. In appellant's original brief, she included Cortes's judgment of conviction, a motion striking words from the indictment in Cortes's case, and a transcript of Cortes's testimony from Love's capital murder trial. A motions panel of this Court struck that brief. When appellant filed a motion to reconsider the Court's order striking her brief, the motions panel of this Court denied appellant's motion, but it also deferred to the submissions panel whether to take judicial notice of appellant's documents.

As appellant acknowledges, "We are reluctant to take judicial notice of facts that go to the merits of [a] dispute." *Gaston v. State*, 63 S.W.3d 893, 900 (Tex. App.—Dallas 2001, no pet.). Generally, "appellate courts take judicial notice of facts outside the record only to determine jurisdiction over an appeal or to resolve matters ancillary to decisions that are mandated by law (e.g., calculation of prejudgment interest when the court renders judgment)." *Id*.

We decline appellant's invitation to depart from that general rule. Judicial notice is particularly ill-fitted for the purpose to which appellant asks us to apply it here. Appellant argues that based on inconsistencies between Cortes's testimony in Love's trial and her testimony in this case, a rational trier of fact would have found

–21–

that Cortes manufactured her story to fit the facts known by the police on September 21, 2018, the date Cortes testified she began telling the truth to prosecutors. She argues that the documents she would have us judicially notice reveal those inconsistencies.

The standard we must apply deals only with "the record evidence adduced at the trial." *Jackson*, 443 U.S. at 324. This includes evidence both properly and improperly admitted, *see, e.g.*, *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007), but it cannot include evidence not admitted. To say otherwise would allow a defendant "to retry the case on appeal"[3] through sufficiency review, which we cannot do. *See Flores v. State*, 620 S.W.3d 154, 162 (Tex. Crim. App. 2021) (Keller, P.J., dissenting) ("We have cautioned reviewing courts not to focus on evidence that was not admitted at trial, to engage in a 'divide and conquer' analysis, or act as a thirteenth juror."). We therefore deny appellant's request to take judicial notice of the documents she included in her original brief and in her motion for reconsideration. *See Lewis v. State*, No. 10-17-00007-CR, 2018 WL 2344762, at *5 (Tex. App.—Waco May 23, 2018, no pet.) (mem. op., not designated for publication) ("We remind counsel that, in our review of [appellant's] issues, we are confined to the record before us and that the attachment of exhibits to a brief does not constitute formal inclusion in the record.").

---

[3] *Posey v. State*, 966 S.W.2d 57, 63 (Tex. Crim. App. 1998).

## *Article 38.36 instruction*

In her second issue, appellant argues the trial court erred by including the following instruction in the jury charge:

> You are instructed that you may consider all relevant facts and circumstances surrounding the alleged killing and the previous relationship existing between the defendant and the deceased, if any, together with all relevant facts and circumstances going to show the condition of the mind of the defendant at the time of the offense alleged in the indictment.

At the charge conference, appellant objected to this instruction. She argued the instruction improperly emphasized "everything that the State wants to point out between the accused and Dr. Hatcher." She argued the statutory basis for the instruction, article 38.36 of the Texas Code of Criminal Procedure, "goes to admissibility" and that, while the instruction might be suitable for "a self-defense scenario," it was inapplicable in this case. The State responded that the instruction tracked article 38.36 of the Texas Code of Criminal Procedure. The trial court denied appellant's request to remove the instruction.

"Appellate review of claims of jury-charge error first involves a determination of whether the charge was erroneous and, if it was, then second, an appellate court conducts a harm analysis, with the standard of review for harm being dependent on whether error was preserved for appeal." *Cortez v. State*, 469 S.W.3d 593, 598 (Tex. Crim. App. 2015).

The trial court must deliver to the jury "a written charge distinctly setting forth the law applicable to the case." *See* TEX. CODE CRIM. PROC. art. 36.14. In so doing,

–23–

the court must not express any opinion as to the weight of the evidence. *Id*. The court "must ensure that all of the law applicable to the criminal offense that is set out in the indictment or information is incorporated into the jury charge as well as the general admonishments, including reference to the presumption of innocence, proof beyond a reasonable doubt, unanimity of the verdict, and so forth." *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007).

To ensure compliance with article 36.14, a trial judge should "avoid including non-statutory instructions in the charge because such instructions frequently constitute impermissible comments on the weight of the evidence." *De La Torre v. State*, 583 S.W.3d 613, 617 (Tex. Crim. App. 2019).

The complained-of instruction here was not "non-statutory": it tracked article 38.36 of the Texas Code of Criminal Procedure. Under article 38.36,

> [i]n all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

TEX. CODE CRIM. PROC. art. 38.36. Instructions based on article 38.36 are "traditional part[s] of murder jury charges." Elizabeth Berry & George Gallagher, *Texas Criminal Jury Charges* § 6:450 note (2020).

We do not think the instruction was an improper comment on the weight of the evidence, as appellant argues. The instruction did not reference any specific evidence and it did not "intimate that the jury should resolve any fact question in a

certain way or that any of the evidence bearing upon such a fact question should be given greater weight or credibility than other evidence bearing on the same question." *See Atkinson v. State*, 923 S.W.2d 21, 25 (Tex. Crim. App. 1996).

It therefore did not present the same problem as the instruction at issue in *Bartlett v. State*, 270 S.W.3d 147 (Tex. Crim. App. 2008), a case to which appellant directs us. There, the trial court, in the jury charge, "set out a lengthy explanation of the statute governing the admissibility of the evidence of appellant's refusal to take a breath test and also described the arguments of both parties regarding the significance of that evidence." *Id*. at 152. The court of criminal appeals held that the instruction was an impermissible comment on the weight of the evidence. *Id*. at 154.

In the course of so holding, the court described "three specific circumstances under which a trial court may single out *a particular item of evidence*" in the jury charge "without signaling to the jury an impermissible view of the weight (or lack thereof) of that evidence." *Id*. at 151 (emphasis added). The first is when the law ascribes a particular weight or "a particular or limited significance" to a specific category or item of evidence. *Id*. The second is when "the Legislature has expressly required the trial court to call particular attention to specific evidence in the jury charge when the law specifically identifies it as a predicate fact from which a jury may presume the existence of an ultimate or elemental fact." *Id*. And third, "the

trial court may instruct the jury with respect to evidence that is admissible contingent upon certain predicate facts that it is up to the jury to decide." *Id.*

Here, the article 38.36 instruction told the jury it could consider "all relevant facts and circumstances surrounding the alleged killing and the previous relationship existing between the defendant and the deceased, if any, together with all relevant facts and circumstances going to show the condition of the mind of the defendant at the time of the offense[.]" We do not think this general instruction "single[d] out a particular item of evidence." *See Bartlett*, 270 S.W.3d at 151. The three *Bartlett* categories therefore do not apply.

Furthermore, we find no case holding that including an article 38.36 instruction in the jury charge is error. On the contrary, several of our sister courts have held that article 38.36 instructions are not improper. *See, e.g.*, *Milner v. State*, 262 S.W.3d 807, 809 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (citing *Valentine v. State*, 587 S.W.2d 399, 401–02 (Tex. Crim. App. 1979)).[4] Our sister courts all cite *Valentine* for this rule, but further support for it can be found in an older case, *Wheeler v. State*, 239 S.W.2d 105, 106 (Tex. Crim. App. 1951). The court of criminal appeals in *Wheeler*, in discussing an article 38.36 predecessor statute, "expressly overruled" certain of its cases "[i]nsofar as [they] hold that the substance of [the article 38.36 predecessor] should not be given in the charge, but

---

[4] *See also Roberson v. State*, 144 S.W.3d 34, 42 (Tex. App.—Fort Worth 2004, pet. ref'd); *Gold v. State*, 691 S.W.2d 760, 764 (Tex. App.—El Paso 1985), *aff'd on other grounds*, 736 S.W.2d 685 (Tex. Crim. App. 1987).

should serve only as a guide to the court in passing upon the admissibility of testimony[.]" *Id.*[5]

Accordingly, we conclude that the trial court did not err by denying appellant's request to remove the article 38.36 instruction from the jury charge. *See Cortez*, 469 S.W.3d at 598. We overrule appellant's second issue.

*Law of parties instruction*

In her third issue, appellant argues the trial court erred by failing to properly charge the jury about the application of the law of parties as defined in Texas Penal Code § 7.02(a)(2). The jury was charged, in pertinent part, to find appellant guilty if it found beyond a reasonable doubt that appellant

> did intentionally or knowingly cause the death of Kendra Hatcher . . . by employing Kristopher Love to murder Kendra Hatcher for remuneration or the promise of remuneration . . . and pursuant to said agreement, Kristopher Love did intentionally or knowingly cause the death of Kendra Hatcher by shooting her with a firearm . . . .

The State responds that the first type of capital murder alleged here— "employ[ing] another to commit . . . murder for remuneration or the promise of remuneration"—is "one manner or means of committing capital murder as a principal." Consequently, a law of parties instruction is unnecessary under the State's first theory of capital murder. We agree.

---

[5] We note, though, that the article 38.36 predecessor at issue in *Wheeler* applied only for punishment purposes. *Wheeler*, 239 S.W.2d at 106; *see also Carver v. State*, 510 S.W.2d 349, 353–55 (Tex. Crim. App. 1974).

The First Court of Appeals rejected an argument similar to appellant's in *Lopez v. State*, 493 S.W.3d 126, 137 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd). In that case, the indictment tracked the language of section 19.03(a)(3) of the penal code. *Id.* It alleged the defendant caused the death of the victim by employing three people to murder the victim for remuneration. *Id.* The appellant argued the trial court erred by failing to incorporate the mental state for party liability ("acting with intent to promote or assist the commission of the offense") in the application paragraph. *Id.* "In effect, [the appellant] argue[d] that the trial judge erred because he did not fully instruct the jury on the law of parties in the application paragraph of the jury charge." *Id.* The court of appeals noted the indictment tracked the language of section 19.03(a)(3) and the application paragraph authorized the jury to convict only upon finding that the appellant acted "intentionally or knowingly," as required by section 19.03(a)(3). *Id.* Given that, the court concluded the application paragraph authorized conviction of the appellant "as a principal under the correct *mens rea* element." *Id.*

The pertinent facts are the same here. The indictment and charge tracked section 19.03(a)(3): appellant was indicted, under the first theory alleged, for causing the death of Kendra Hatcher by employing Love to murder Hatcher for remuneration. The charge, reproduced above, reflected the indictment, and it tracked the statute: under section 19.03(a)(3), a person commits capital murder if the person commits murder—that is, "intentionally or knowingly causes the death of an

individual"[6]—and the person "employs another to commit the murder for remuneration or the promise of remuneration." *See* TEX. PENAL CODE § 19.03(a)(3).

It may be that, normally in a murder case, when a defendant solicits murder but does not pull the trigger, he or she should be charged under the law of parties. But in a capital murder case charged under section 19.03(a)(3), the "parties" or "solicitation" aspect of the crime is effectively built into the statute. Here, the jury was asked whether appellant caused the victim's death *by employing Love to shoot her*.

Thus, the trial court properly instructed the jury it could convict appellant as principal, not as party. *See also Metcalf v. State*, No. 14-19-00101-CR, 2020 WL 1880991, at *4–6 (Tex. App.—Houston [14th Dist.] April 16, 2020, no pet.) (holding that a party instruction "would have been superfluous and was not required" when the defendant was charged with causing the victim's death by employing a hit man to kill the victim for remuneration). We find no error in the charge, and we overrule appellant's third issue. *See Cortez*, 469 S.W.3d at 598.

### *Voir dire*

Appellant argues in her fourth issue that one of the veniremembers "was improperly excused from the jury panel because she was not shown to be disqualified to serve as a juror." Following an off-record discussion, the trial court stated, "All

---

[6] TEX. PENAL CODE § 19.02(b)(1).

right. We're on the record. It appears that Venireperson [ ] Sweet, is posting online about this trial. The State has no objection to excusing her." Appellant objected and asked "that she be admonished should we get to her." The trial prosecutor then stated, "Well, to that extent, then, we challenge her for cause. She's violated the Court's instructions." The trial court granted the challenge for cause.

"A challenge for cause is an objection made to a particular juror, alleging some fact which renders the juror incapable or unfit to serve on the jury." TEX. CODE CRIM. PROC. art. 35.16(a). "The State may assert grounds for a challenge that are not included in Article 35.16 where the challenge is based on facts demonstrating that the prospective juror would be incapable of or unfit for jury service." *Granados v. State*, 85 S.W.3d 217, 230 n.37 (Tex. Crim. App. 2002). Challenges that are not based on one of the enumerated grounds in article 35.16 are "addressed to the sound discretion of the trial judge." *See Mason v. State*, 905 S.W.2d 570, 577 (Tex. Crim. App. 1995). A trial court's ruling on a challenge for cause should be reviewed "with considerable deference because the trial judge is in the best position to evaluate a veniremember's demeanor and responses." *Gardner v. State*, 306 S.W.3d 274, 295–96 (Tex. Crim. App. 2009).

Even if the trial court erred by striking this juror, which we do not decide, we do not think any error could have affected appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b). "[A] defendant has no right that any particular individual serve on the jury." *Jones v. State*, 982 S.W.2d 386, 393 (Tex. Crim. App. 1998). Her

–30–

"only substantial right is that the jurors who do serve be qualified." *Id.* Thus, "the erroneous dismissal of a prospective juror calls for reversal 'only if the record shows that the error deprived the defendant of a lawfully constituted jury.'" *Davis v. State*, No. 05-19-01316-CR, 2021 WL 3671196, at \*6 (Tex. App.—Dallas Aug. 18, 2021, no pet.) (mem. op., not designated for publication) (quoting *Jones*, 982 S.W.2d at 394). We look to the fairness and impartiality of the jurors who actually sat to make that determination. *See Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009).

Here, appellant does not complain the sworn jurors were unfair or unable to be impartial. Further, our review of the record does not raise any such concern. Given that "we presume that jurors are qualified absent some indication in the record to the contrary[,]" *Ford v. State*, 73 S.W.3d 923, 925 (Tex. Crim. App. 2002), we do not think any error in granting the State's challenge to this veniremember affected appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b).

In disregarding any non-constitutional error under rule 44.2(b), we necessarily reject appellant's argument that any error was of constitutional dimension because it was "about the juror's right to sit on the jury" or about the juror's right to free speech. Appellant did not make these objections at trial, and they are therefore not preserved for our review. *See Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012) ("The point of error on appeal must comport with the objection made at trial."). Appellant's fourth issue is overruled.

In her fifth issue, appellant argues the trial court unlawfully excused Veniremember Perry from the panel, "violating [appellant's] right to have the State's peremptory challenges limited to 10." After voir dire, the State questioned Veniremember Perry about appellant's Fifth Amendment right not to testify. Perry admitted that if appellant did not testify, "then that would probably like push me a little more towards" guilt. He said, "it would affect me, yeah." Defense counsel then noted that the trial judge would give him an instruction telling him not to consider appellant's failure to testify; counsel asked Perry if he could follow the judge's instruction. Perry responded, "I cannot."

The State challenged him for cause. Appellant objected to the State's challenge, arguing that the State was not permitted to rely upon the Fifth Amendment privilege in challenging a juror. The trial court granted the State's challenge. Appellant then requested an additional peremptory challenge, which the court denied.

A challenge for cause may be made by the State if the juror "has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment." TEX. CODE CRIM. PROC. art. 35.16(b)(3). As the State points out, the court of criminal appeals has held that a "venireperson is challengeable by the State for cause under article 35.16(b) based upon their belief that the defendant's failure to testify constitutes an admission of guilt." *Flores v. State*, 871 S.W.2d 714, 719 (Tex. Crim. App. 1993). "That such a bias might have

–32–

been in favor of the State does not prevent the State from making a challenge on that basis." *Id*.

Thus, we conclude the trial court did not err by granting the State's challenge, given Perry's clear statement that he would not be able to follow the court's Fifth Amendment instruction. *See id*.

In deciding the State could challenge Perry for cause under article 35.16(b)(3), we reject appellant's contention she was entitled to "waive" Perry's disqualification as a trump card against the State's challenge. Appellant cites no authority for her claim, which, we note, would contradict the court of criminal appeals' holding in *Flores*. We also reject appellant's contention that the State, in effect, received an additional peremptory strike when the trial court granted the State's challenge for cause of Perry. This is, as the court of criminal appeals put it in another case, "not correct." *Jones*, 982 S.W.2d at 393 ("It is especially wrong to equate the State's challenge for cause to a peremptory challenge, because the State has the right to challenge disqualified jurors even when their disqualifications might seem to make them favor the State."). We overrule appellant's fifth issue.

*Evidentiary issues*

In her sixth issue, appellant argues the trial court violated her constitutional right to present evidence that called Cortes's credibility into question. During her cross-examination of Cortes, appellant sought to play "video snippets" from Cortes's interviews with the police, which totaled about ten minutes of footage. Appellant

argued the jury "needs to see exactly what [Cortes] looks like when she lies." She argued that several state and federal constitutional provisions gave her the right to play video clips of Cortes's police interviews to show "what Cortes looks like when she lies." Defense counsel explained, "Our trial theory is when [Cortes] . . . gets boxed into something, gets caught in her lies, her go-to deal is to blame [appellant]."

The trial court denied appellant's request "to play any excerpts from the videotape," noting that "the jury can certainly evaluate the demeanor of the witness because she's sitting on the witness stand." The court further ruled that appellant had "an absolute right to ask [Cortes] any question . . . regarding to what she lied about, how she lied, when she lied."

On appeal, appellant argues the videos were admissible under Texas Rule of Evidence 611(b). She also argues the Confrontation Clause required the admission of her videos. A trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion. *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016). "A witness may be cross-examined on any relevant matter, including credibility." TEX. R. EVID. 611(b). "Extrinsic evidence of a witness's prior inconsistent statement is not admissible unless the witness is first examined about the statement and fails to unequivocally admit making the statement." TEX. R. EVID. 613(a)(4). Similarly, "[e]xtrinsic evidence of a witness's bias or interest is not admissible unless the witness is first examined about the bias or interest and fails to unequivocally admit it." *Id*. 613(b)(4). But an argument that evidence should have

–34–

been admitted to attack a witness's credibility may also involve the Confrontation Clause, which protects an accused's right "to be confronted with the witnesses against him." U.S. CONST. amend. VI; *Johnson*, 490 S.W.3d at 909. The court of criminal appeals in *Hammer v. State*, 296 S.W.3d 555 (Tex. Crim. App. 2009), explained the relationship between the right of confrontation, the rules of evidence, and the trial court's discretion:

> The Sixth Amendment right to confront witnesses includes the right to cross-examine witnesses to attack their general credibility or to show their possible bias, self-interest, or motives in testifying. This right is not unqualified, however; the trial judge has wide discretion in limiting the scope and extent of cross-examination. Generally, the right to present evidence and to cross-examine witnesses under the Sixth Amendment does not conflict with the corresponding rights under state evidentiary rules. Thus, most questions concerning cross-examination may be resolved by looking to the Texas Rules of Evidence. In those rare situations in which the applicable rule of evidence conflicts with a federal constitutional right, Rule 101(c) requires that the Constitution of the United States controls over the evidentiary rule. Rule 101(c) also states, "Where possible, inconsistency is to be removed by reasonable construction" as well as by reasonable application of the rule. Thus, compliance with the reasonable construction and application of a rule of evidence will, in most instances, avoid a constitutional question.

296 S.W.3d at 561. This "wide discretion" means that a defendant is "not entitled to 'cross-examination that is effective in whatever way, and to whatever extent,' he might wish." *Johnson*, 490 S.W.3d at 909–10 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

Here, Cortes admitted during direct examination she lied to the police and prosecutors many times because she "was trying to deflect attention from" herself. She lied "over and over and over again." She stated that she changed her mind and

decided to start telling the truth after her mother died. She said she did not have a plea-bargain agreement in place when she first told the State the whole truth. Eventually, she testified, she entered the first half of an agreement by which she would testify at Love's and appellant's trials and plead guilty and serve thirty-five years' confinement in return. On cross-examination, appellant went through particular lies Cortes told the police. Cortes admitted to each one. She admitted that she told Detective Barnes she never went into the parking garage, which, she admitted, was a lie. She admitted she told Barnes that she intended to take her son to the park, which, she conceded, was a lie.

Thus, because Cortes admitted to her prior inconsistent statements, the trial court could have acted within its discretion by finding that extrinsic video evidence was properly excluded under rule 613(a)(4). Appellant relies on rule 611(b), which states that a "witness may be cross-examined on any relevant matter, including credibility." TEX. R. EVID. 611(b). But, as we detailed above, appellant was free to cross-examine Cortes about many things, including her credibility and the lies she previously told. Nothing in rule 611(b)'s general terms required the admission of video of Cortes's interview, particularly since she freely confessed her prior dishonesty. *See* TEX. R. EVID. 613(a)(4).

We also think the trial court would have been within its discretion in concluding under rule 403 that the video's probative value was substantially outweighed by consideration of "needless presentation of cumulative evidence."

–36–

TEX. R. EVID. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, or needless presentation of cumulative evidence."). Appellant's stated reason for offering the video was to let the jury see Cortes's demeanor as she told falsehoods to the police. But, as the trial court pointed out, "the jury can certainly evaluate the demeanor of the witness because she's sitting on the witness stand." Thus, the court could have concluded any probative value in the video was substantially outweighed by concerns of needless cumulation. *See Shanta v. State*, No. 01-05-01133-CR, 2007 WL 1119897, at *2 (Tex. App.—Houston [1st Dist.] Apr. 12, 2007, no pet.) (mem. op., not designated for publication) (when defendant offered complainant's videotaped statement to show her demeanor, "the trial court would have been within its discretion to exclude the evidence because the videotape would have been cumulative of the complainant's trial testimony that showed her demeanor, her character, and the way she answers questions").

Nor do we think these evidentiary bases for exclusion ran afoul of any constitutional rights. Appellant cites *Hammer* and *Johnson* for her constitutional argument. Neither of these authorities support appellant's argument that the video of Cortes was admissible to show what Cortes "looks like when she lies." As discussed above, both *Hammer* and *Johnson* clearly articulate a trial court's "wide discretion" to "limit the scope and extent of cross-examination[.]" *Hammer*, 296

S.W.3d at 561; *Johnson*, 490 S.W.3d at 909. That discretion is limited by the Confrontation Clause particularly when it comes to "cross-examining a witness concerning possible motives, biases, and prejudices." *See Johnson*, 490 S.W.3d at 910. Cortes's demeanor in being interviewed by the police did not go to any motive, bias, or prejudice she had in testifying. Indeed, as discussed in the next point of error, appellant cross-examined Cortes regarding her possible motives, biases, and prejudices when she questioned Cortes about the plea-bargain deal she made with the State.

We conclude that the trial court acted within its discretion when it ruled appellant's video exhibit inadmissible. *See Johnson*, 490 S.W.3d at 908. Appellant's sixth issue is overruled.

Appellant argues in her seventh issue that the trial court "deprived [her] of her constitutional right to present relevant evidence" relating to Cortes's eligibility for parole under the plea bargain agreement Cortes reached with the State.

At trial, the State asked Cortes if she had a "deal in place" when she first told the police the truth. Cortes answered,

A. Not at that time. It wasn't until afterwards.

Q. We told you that we were looking for some truth from you?

A. Yes.

Q. And how many times have I told you that all I want to hear from you is the truth?

A. Over and over again.

–38–

Q. And when -- after we sat down and talked to you and talked to you again and confirmed some of the other things that we had questions about with you –

A. Yes.

Q. -- you entered the first half of -- of a deal for you; is that right?

A. That's correct.

Q. And what is your deal?

A. I testified at Kristopher Love's and Brenda Delgado's trial, and I get a guilty plea for 35 years.

Q. For 35 years?

A. Yes.

Q. So you get -- you will be guilty of murder, which you've plead guilty to a murder?

A. Yes.

Q. And you've done the first half of that in front of this Judge; is that right?

A. Yes.

Q. And ultimately, it's that -- if -- if you don't tell the truth that -- that thing can go away?

A. Yes.

Q. If we find that you are lying to us, if we were able to confirm that -- that what you're telling us is not truthful, you understand the consequences of that?

A. Yes.  I will possibly face the death penalty.

And on cross-examination, appellant twice more reiterated Cortes's thirty-five-year plea bargain.  The second time, appellant asked Cortes,

Q. Now, we have heard what you're willing to do by your statements here for $500. You knew then before you went into that meeting with the prosecutors and cut your deal, you knew then you could be facing the death penalty, as we previously discussed, correct?

A. Yes.

Q. And when this deal was made, that they would take capital off and let you plead to a straight murder, you knew that was a huge difference, didn't you?

A. Yes.

Q. You knew that unlike capital murder, a straight murder is affected by the parole laws, correct?

A. I didn't know that.

. . . .

Q. Are you telling this jury that you have no concept of parole?

A. I didn't know -- rephrase your question.

Q. Prior to cutting the deal, is it your testimony before this jury that you have no concept of the application of the parole laws and how they may affect you?

A. I didn't understand how parole worked, if that's what you're asking me.

. . . .

Q. Do you understand it today?

A. Yes.

Then, when appellant tried to question Cortes further about parole, the State objected that appellant's line of questioning was improper. The trial court sustained the objection. Appellant questioned Cortes one last time about her deal:

Q. You understand that if you don't cut a deal with these guys, they had you at an absolute minimum life without parole, correct?

–40–

A. Yes.

Q. And now you understand that with the deal you cut, you'll be breathing free air by the time you're my age, no matter what happens to you; truthful statement?

A. Yes.

"[E]xposing a witness's motivation to testify against a defendant is a proper and important function of the constitutionally protected right to cross-examination." *McDuff v. State*, 939 S.W.2d 607, 617 (Tex. Crim. App. 1997). Defendants are allowed "great latitude to show any fact which would tend to establish ill feeling, bias, motive, and animus on the part of the witness testifying against" them. *Id*. However, "this right does not prevent a trial court from imposing some limits on the cross-examination into the bias of a witness." *Id*.

In *McDuff*, the appellant sought to question an accomplice witness "about his knowledge of the difference between the parole eligibility time period" for a capital-murder life sentence versus a life sentence for someone convicted of aggravated kidnapping or aggravated robbery. *Id*. The court of criminal appeals held that it was permissible for the appellant to show that the witness had serious pending state charges because they could have affected his testimony, but that it was impermissible to "elicit the accomplice witness's knowledge or lack of knowledge of the difference in parole eligibility minimum time periods" because it "would not have any further shown his vulnerable relationship with the State or his potential motive, bias, or interest."

Here, both the State and appellant questioned Cortes thoroughly about the plea bargain agreement she made with the State. She explained that it was for thirty-five years' confinement and that she was possibly avoiding the death penalty or life without parole in exchange for pleading guilty and testifying in Love's and appellant's trials. Thus, appellant was able to expose Cortes's motive to testify against appellant by questioning her about the substantial benefit she received by pleading guilty and agreeing to testify.

As in *McDuff*, we cannot see how questioning appellant any further about her knowledge of parole eligibility would have "any further shown [her] vulnerable relationship with the State or [her] potential motive, bias, or interest." *Id.* Accordingly, we do not think the trial court abused its discretion in imposing this limit on appellant's cross-examination of Cortes. *Id.* Appellant's seventh issue is overruled.

In her eighth issue appellant argues the trial court erred by overruling her "hearsay objection to an expert's written report of his analysis and opinions of physical evidence." A forensic analyst analyzed samples from Hatcher's hands and found there was gunshot residue on both of them. The analyst testified that meant Hatcher either "fired a gun or handled a gun that had been fired or was in the proximity of a gun when the gun was fired." The State asked the analyst about "a hypothetical scenario": if Hatcher "had her hands behind her head and was shot

execution style in the back of the head, coming out her chin, would your findings be consistent with that hypothetical situation?" The analyst answered, "Yes, it would."

A copy of the analyst's report documenting his findings was then admitted over appellant's hearsay objection. The report noted that "six particles characteristic of primer gunshot residue were confirmed on the sample stubs collected from the hands of Kendra Hatcher[,]" five from the back of the left hand and one from the back of the right hand. The presence of the residue, the report concluded, "could be due to the individual" firing a gun, handling a gun or object with residue, or "being in the proximity" of a gun when it was fired.

Assuming the report was inadmissible hearsay, we conclude that its admission did not affect appellant's substantial rights. "A violation of the evidentiary rules that results in the erroneous admission of evidence is non-constitutional error." *Jones v. State*, 111 S.W.3d 600, 604 (Tex. App.—Dallas 2003, pet. ref'd). We disregard any non-constitutional error that does not affect a defendant's "substantial rights." TEX. R. APP. P. 44.2(b). A substantial right is affected if an error has a substantial and injurious effect or influence in determining the jury's verdict. *See, e.g.*, *Thomas v. State*, 505 S.W.3d 916, 926 (Tex. Crim. App. 2016).

The report at issue here reflected what the analyst testified to—gunshot residue was found on Hatcher's hands, which meant one of three things: Hatcher fired a gun, handled a gun that had been fired, or was near a gun when it was fired. Since the report restated what its author had already testified to, we cannot conclude

its admission had a substantial and injurious effect or influence on the jury's verdict. *See, e.g.*, *Mendoza v. State*, 69 S.W.3d 628, 634 (Tex. App.—Corpus Christi–Edinburg 2002, pet. ref'd) (holding that admission of hearsay testimony was rendered harmless by admission of the same or similar evidence without objection). Appellant's substantial rights were therefore not affected by any error, so we disregard it. *See* TEX. R. APP. P. 44.2(b). Appellant's eighth issue is overruled.

In her ninth issue, appellant argues the trial court erred by admitting a video of security footage of the street in front of Ortiz's house, which, she argues, was not properly authenticated. Appellant objected "as to lack of personal knowledge, as well as hearsay and Sixth and Fourteenth Amendment confrontation." On appeal, appellant argues only that the State failed to properly authenticate the video.

A trial court's ruling on an authentication issue is reviewed on appeal for abuse of discretion. *Angleton v. State*, 971 S.W.2d 65, 67 (Tex. Crim. App. 1998). "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." TEX. R. EVID. 901(a). "In a jury trial, it is the jury's role ultimately to determine whether an item of evidence is indeed what its proponent claims; the trial court need only make the preliminary determination that the proponent of the item has supplied facts sufficient to support a reasonable jury determination that the proffered evidence is authentic." *Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015). "Conclusive proof of authenticity before allowing

admission of disputed evidence is not required." *Fowler v. State*, 544 S.W.3d 844, 848 (Tex. Crim. App. 2018). Rule 901 requires only "some evidence" to support a finding that the evidence at issue is what the proponent says it is. *Id.*

The State presented evidence that Detective Barnes obtained a copy of the surveillance video from Ortiz's neighbor. The first part of the video showed the street in front of Ortiz's house on September 2, when Ortiz, appellant, and Cortes met up to exchange cars. It was admitted without objection as State's Exhibit 91 during the testimony of Cortes. In her testimony, Cortes stated that the video depicted the street in front of Ortiz's house and she confirmed she, Ortiz, and appellant were the individuals portrayed in the video. Ortiz also testified that the video captured the meeting between himself, appellant, and Cortes. The second part of the video, which appellant complains about here, depicted the same view of the street but from the next day, when appellant and Cortes met to discuss the Jeep. It was admitted as State's Exhibit 408 during the testimony of Detective Barnes, who testified that it was a copy of the surveillance video across from Ortiz's house. When it was admitted, the prosecutor told the court that it was "a copy of the security camera" and was a "separate segment" from the one that had already been shown. The video bears a date and timestamp that matched Ortiz's testimony about when he and appellant met the evening of September 3. The date and time also matched the information appellant provided to Detective Barnes about when she and Ortiz met.

Given that, we cannot conclude that the trial court abused its discretion in finding that "some evidence" supported the authenticity of the video. *See Fowler*, 544 S.W.3d at 848. Appellant's ninth issue is overruled.

Finally, appellant argues in her tenth and eleventh issues that the trial court erred by admitting "backdoor hearsay" through the testimony of Detective Barnes and that this testimony was also "improper bolstering." Appellant notes in her brief that "the State repeatedly asked [Barnes] about statements made to him during the investigation—and implied that such information proved the falsity of what [appellant] told him." She then cites eleven pages in the record without noting what testimony in particular she complains about.

The reporter's record pages appellant cites include the following objected-to testimony. Barnes testified over appellant's hearsay objection that, as a result of his investigation, he learned Ortiz had information about the Jeep and Ortiz was the owner of the Jeep. Barnes testified Ortiz informed him his Jeep was borrowed by appellant and Cortes on the morning of the offense because Cortes's car was having mechanical issues and that they were supposed to return it "in the evening hours." Barnes further testified that Ortiz explained to him that he and appellant were childhood friends. Barnes also testified "that the information related to me that [Cortes] dropped [appellant] off at a library at the very beginning of the investigation." Barnes testified he spoke with Menendez and learned he had appellant's car. Barnes testified that he spoke with a woman named Mirlande. Over

appellant's overruled hearsay objection, he said that there had been a dating relationship between Mirlande and Paniagua after Paniagua dated appellant. He testified over overruled hearsay and improper-bolstering objections that appellant, not Cortes, borrowed a BMW, not as appellant claimed in her interview with Barnes. Finally, Barnes testified, over appellant's overruled hearsay objection, that as he interviewed Cortes, she "bit-by-bit" implicated herself in the offense.

Assuming without deciding that any of this testimony was inadmissible hearsay or "improper bolstering," we do not think any error affected appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b). The testimony at issue here also came into evidence through other witnesses. *See, e.g.*, *Mendoza*, 69 S.W.3d at 634 (admission of hearsay testimony rendered harmless by admission of same or similar evidence without objection). Ortiz testified he contacted the police and spoke with Detective Barnes about his Jeep and appellant, his childhood friend, borrowed it and was supposed to return it in the evening. Evidence that Cortes dropped off appellant at the library was admitted through Cortes's testimony and through the video of appellant's interview with Barnes. Menendez testified appellant brought her car to him to work on and that appellant borrowed the BMW from him. Paniagua testified he dated a woman named Mirlande in 2015. And Cortes testified she participated in the murder of Hatcher. Accordingly, we do not think Barnes's repetition of these details from his investigation could have had a substantial and injurious effect or influence in determining the jury's verdict. *See Thomas*, 505 S.W.3d at 926. We

disregard any error.  *See* TEX. R. APP. P. 44.2(b).  Appellant's final two issues are overruled.

<div align="center">CONCLUSION</div>

We affirm the trial court's judgment.


<div style="margin-left:50%">
/Ken Molberg/
_____
KEN MOLBERG
JUSTICE
</div>

190821f.p05
Publish
TEX. R. APP. P. 47.2(b)

<div align="center">–48–</div>



# Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

BRENDA DELGADO, Appellant

No. 05-19-00821-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 363rd Judicial District Court, Dallas County, Texas Trial Court Cause No. F15-76401. Opinion delivered by Justice Molberg. Justices Reichek and Nowell participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 21st day of October, 2021.